FILED

03/25/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0226

DA 22-0226

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 53

STATE OF MONTANA,

     Plaintiff and Appellee,

  v.

BRADLEY JAY HILLIOUS,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-20-459(B)
Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Tammy Hinderman, Appellate Defender, Jeff N. Wilson, Assistant Appellate Defender, Helena, Montana

     For Appellee:

          Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

          Travis Ahner, Flathead County Attorney, John Donovan, Deputy County Attorney, Kalispell, Montana

     For Amicus Curiae Montana County Attorneys' Association:

          Matthew T. Cochenour, Cochenour Law Office, PLLC, Helena, Montana

                          Submitted on Briefs:  March 5, 2025

                          Decided:  March 25, 2025

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    Bradley Hillious (Hillious) appeals his deliberate homicide conviction in the Eleventh Judicial District Court, Flathead County.  He argues that he is entitled to a new trial because the clerk did not comply with the statutory requirements for assembling his jury panel.  He also contends that the District Court violated his right of confrontation when it admitted inadmissible hearsay statements of the victim into evidence.  We address the following restated issues:

1.  *Whether there was substantial compliance with Montana's jury selection statutes despite the clerk's failure to certify to the sheriff jurors who did not return their questionnaires.*

2.  *Whether Hillious's untimely objection and motion for new trial was supported by good cause or in the interest of justice.*

3.  *Whether Hillious is entitled to a new trial because the District Court erroneously admitted testimonial hearsay in violation of his right to confront witnesses.*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    On December 24, 2020, the State charged Hillious with deliberate homicide in violation of § 45-5-102(1), MCA, for purposely or knowingly causing the death of his wife Amanda.  The charge was filed nine days after the Flathead County Sheriff's Office responded to a 911 call at the couple's home in Kalispell.  A deputy sheriff found Amanda inside, unresponsive and not breathing, at the bottom of a staircase.  Emergency personnel took Amanda to the hospital, where she died the following day.  The medical examiner determined that the ultimate cause of death was strangulation associated with blunt-force injuries, consistent with homicide.

2

¶3     Prior to trial, Hillious moved to exclude certain statements Amanda made before her death.[1]  Hillious sought to preclude the State from introducing a petition for temporary order of protection (TOP) that Amanda filed against Hillious on April 17, 2020, and statements Amanda made to her coworker, Sara Prangley, in text messages that same month.  More generally, Hillious challenged "Amanda's statements to her coworker, friends, family, or other lay person . . . regarding [Hillious]."  The District Court denied Hillious's request to exclude the TOP petition, subject to proper foundation.  Noting that Hillious had not produced to the District Court the particular statements Amanda had made to others, the District Court ruled that it would "consider the usual concerns—relevance, competency, authenticity—in determining their admissibility as well as their testimonial nature."

¶4     The State began the trial with testimony from two of Amanda's minor children, A.H. and J.H., who were present during the December 15 incident.  Six-year-old A.H. testified that his mom fell down the stairs, his dad came running down, and when A.H. came out of his room to look, he saw that his mom's "ear was gone" and there was blood on the floor. A.H. also heard Amanda tell Hillious to "stop" and Hillious order Amanda to "shut up." A.H.'s twelve-year-old brother, J.H., testified that Hillious and Amanda were arguing that morning; that he saw Hillious hit Amanda with his fist and drag her into the bedroom; and

---

[1] Although Hillious titled it a "Motion to Suppress," the motion is better characterized as a motion in limine.  *See Motion to Suppress*, Black's Law Dictionary (12th ed. 2024) (especially "a request that the court prohibit the introduction of illegally obtained evidence"); *Motion in Limine*, Black's Law Dictionary (12th ed. 2024) ("A pretrial request that certain inadmissible evidence not be referred to or offered at trial.").  We refer to the motion as such in this Opinion.

that Amanda told him to stop. J.H. went to his room as Hillious directed and heard Amanda go downstairs and say, "Stop hitting me" and "Call 911." J.H. heard Amanda come partway up the stairs, then he heard "a big bang." J.H. testified that Hillious told him "[n]ot to tell the cops that he did it."

¶5 The State called Amanda's mother, Michelle Wungluck, who testified that Amanda called her in April 2020. Wungluck told the jury that Amanda was distraught after Hillious broke her phone, put his hands around her neck, and threatened her with a gun. Wungluck explained that Amanda had locked herself in her car while waiting for officers to arrive because she was afraid. Wungluck said Amanda planned to bring the kids to visit her. But while they were on the phone, Hillious started taking the kids out of the car, saying they could not leave. The State also offered the TOP petition through a law enforcement witness, which the District Court admitted without contemporaneous objection from Hillious.

¶6 Sara Prangley testified for the State about her work and frequent communications with Amanda. Through Prangley, the State admitted the text messages Amanda sent her in April 2020. Hillious again made no objection, except to having the witness describe the content of the messages, which he argued "speak for themselves."

¶7 The jury found Hillious guilty of deliberate homicide on January 14, 2022. During the pendency of this appeal and more than a year and a half after his conviction, Hillious filed a motion for new trial arguing that the clerk failed to comply with § 3-15-405, MCA, in assembling the jury panel for his case. We granted Hillious's motion to stay his appeal

4

until the District Court ruled on his motion. The District Court considered Hillious's motion for new trial and supporting memoranda from the State regarding the practices of the Flathead County Clerk of Court in forming and selecting juries. The State attached an order from *State v. Hinkle*, No. DC-22-242 (Eighth Jud. Dist. Ct. Apr. 27, 2022), in which the defendant challenged pretrial the formation of his jury panel, and an order from *State v. Shaw*, No. DC-21-378 (Eleventh Jud. Dist. Ct. Sept. 28, 2021), denying a motion for new trial in which Shaw alleged the same statutory violation as here. Hillious also submitted the transcript of the hearing on Shaw's motion for new trial in which the Flathead County Clerk of Court and Jury Commissioner, Peg Allison (Allison), and Flathead County Undersheriff, Nick Salois (Salois), testified.

¶8 In the *Shaw* hearing, Allison testified to her process for jury selection, summarized in relevant part here. Each year the Montana Supreme Court Administrator's Office provides her with the names of persons qualified to potentially serve as jurors based on voter registration records, driver's license records, and Montana identification card records. From the list of approximately 140,000 names, Allison randomly draws 7,000 names twice a year for a total of 14,000 persons potentially serving a 6-month term. These potential jurors are sent a notice that they are "on call" for jury duty and required to fill out a questionnaire included with the notice and return it to the clerk. Of the 7,000 notices sent, the post office routinely returns approximately 1,000 as undeliverable. Allison sends new notices to those that have a forwarding address, which is only about 2%. Allison then removes from the jury pool those potential jurors who have failed to return or respond with

their questionnaire. Later, Allison sends out a summons to the smaller group of individuals who returned their questionnaire who are randomly selected for trial in a particular case. Of the 7,000 used to draw Shaw's jury pool, 2,507 persons responded by completing questionnaires. 2,742 persons were designated "Available Without Questionnaire," which represents those that neither responded to the jury notice nor completed a questionnaire. Allison assumed individuals in this group "probably" received the notice but ignored it or either had died or moved. Also, 1,232 persons were temporarily excused based on information they had sent in.

¶9 Allison has not certified the list of potential jurors who failed to respond with a questionnaire for several years. She testified she previously certified the list to the sheriff as required by statute, but on every occasion the sheriff's office told her they did not have the resources to personally serve the jurors. Because compiling the list was time consuming, Allison eventually stopped certifying the list to the sheriff. Allison testified that she randomly drew potential jurors from the group of people who had returned questionnaires; the groups that were undeliverable and that did not return questionnaires were likewise random. These persons were, therefore, randomly summoned for the jury trial to be held.

¶10 Undersheriff Salois then testified that his office had previously received certified lists of nonresponsive jurors, but that successful personal service was very rare, with only about 10% of those nonresponsive jurors being personally served. Additionally, Salois did not know whether the persons subsequently served actually filled out and returned their

6

questionnaires to the court. Salois was not aware of any person within the last 20 years being personally served by his office with notice and a questionnaire.

¶11 The parties do not dispute that the foregoing method of selecting and forming a jury was employed in Hillious's trial. Indeed, the clerk's manner of securing potential jurors appears the same across numerous counties in the state. *See also State v. Hinkle*, No. DC-22-242 (Eighth Jud. Dist. Ct. Apr. 27, 2022); *State v. Brown*, No. DC-22-302 (Eighth Jud. Dist. Ct. May 20, 2022); *State v. McCarty*, No. DC-23-152 (Eleventh Jud. Dist. Ct. Apr. 19, 2023).

¶12 In its order denying Hillious's motion for new trial, the District Court concluded that personal service on nonresponders did nothing towards advancing the goal of ensuring the random nature of the selection process because there was no assurance that the sheriff could or would successfully serve those persons; the requirement of personally serving nonresponsive jurors or potentially nonexistent jurors would be both fruitless and nonsensical. Nor was there evidence that any identifiable group was more likely than another to fail to respond to a jury notice or that personal service on a person already lawfully served with notice by mail would increase the random nature of the selection process. The District Court concluded that the intent of the personal service requirement was to ensure enough jurors were present, not for every noticed person to have to appear. Accordingly, the District Court held the failure of personal service did nothing to undermine or materially affect the random nature or objectivity of the jury selection process.

**STANDARDS OF REVIEW**

¶13 We review for abuse of discretion a district court's denial of a motion for new trial and its evidentiary rulings. *State v. Gomez*, 2020 MT 73, ¶ 40, 399 Mont. 376, 460 P.3d 926 (citations omitted). We review de novo a trial court's interpretation of the Sixth Amendment to the United States Constitution. *State v. Staudenmayer*, 2023 MT 3, ¶ 10, 411 Mont. 167, 523 P.3d 29 (citation omitted).

**DISCUSSION**

¶14 *1. Whether there was substantial compliance with Montana's jury selection statutes despite the clerk's failure to certify to the sheriff jurors who did not return their questionnaires.*

¶15 Montana's jury selection statutes contemplate a jury drawn from a fair cross-section of the community because a "fair cross-section requirement [is] fundamental to the jury trial guaranteed by the Sixth Amendment" and Article II, Section 24 of the Montana Constitution. *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S. Ct. 692, 697-98 (1975). "The requirement of a fair cross-section, however, does not guarantee that juries be 'of any particular composition,' or that 'venires . . . [be] a substantially true mirror of the community.'" *United States v. Royal*, 174 F.3d 1, 11 (1st Cir. 1999) (quoting *Taylor*, 419 U.S. at 538, 95 S. Ct. at 703; *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir. 1985) (en banc)). All that is required is that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538, 95 S. Ct. at 703.

8

¶16    Montana's jury selection statutes direct the clerk of court to "serve notice by mail on the persons drawn as jurors and require the persons to respond by mail as to their qualifications to serve as jurors." Section 3-15-405, MCA. If a person does not respond, the clerk is directed to "certify the failure to the sheriff, who shall serve the notice personally on the person." Section 3-15-405, MCA. Here, Allison properly mailed notices to persons drawn as potential jurors but did not certify nonresponsive jurors to the sheriff, which resulted in those nonresponsive jurors not being personally served.

¶17    However, despite this statutory violation of § 3-15-405, MCA, we are not required to "reverse every case where a violation occurs in the statutory process governing the formation of a trial jury." *State v. LaMere*, 2000 MT 45, ¶ 55, 298 Mont. 358, 2 P.3d 204. Rather, we utilize a "substantial compliance" standard, that is, a statutory violation in the jury selection process only warrants reversal if the lack of compliance affects the randomness and objectivity of the jury pool selection. *LaMere*, ¶¶ 55-56.

*A. The Substantial Compliance Standard*

¶18    Our case law has frequently been guided by federal law developed under the Jury Selection and Service Act of 1968 (JSSA). *LaMere*, ¶ 56; *see generally* 28 U.S.C. §§ 1861-1878. Federal courts interpreting and applying the JSSA utilize the same substantial compliance requirement as Montana. Under the JSSA, the dismissal of an indictment may only occur when there has been a "substantial failure to comply" with the statutory provisions for selecting a grand jury or petit jury. 28 U.S.C. § 1867(a). Whether there has been a substantial failure to comply requires that the alleged violation be assessed

9

within the context of the principles underlying a defendant's fundamental constitutional right to a fair and impartial jury—which is what the statutes are designed to protect. Thus, while statutory jury selection procedures are designed to protect against violations of this underlying constitutional right, "[t]echnical departures from the jury selection statutes and violations which do not threaten the goals of random selection and objective disqualification do not constitute a substantial failure to comply." *State v. Bearchild*, 2004 MT 355, ¶ 15, 324 Mont. 435, 438, 103 P.3d 1006; *LaMere*, ¶ 58.

¶19    Two important principles underlying the JSSA and applying with equal force to Montana's jury selection statutes ensure the statutory procedure protects a defendant's constitutional right to a fair and impartial jury:

> (1) *[R]andom selection* of juror names from the voter lists of the district or division in which the court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of *objective criteria* only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

H.R. Rep. No. 90-1076 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1972, 1793 (emphasis added). Hence, a "substantial failure to comply encompasses a statutory violation that affects the 'random nature or objectivity of the selection process.'" *LaMere*, ¶ 57 (quoting *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir. 1977), *overruled on other grounds*, *United States v. Singleterry*, 683 F.2d 122 (5th Cir. 1982)). "A substantial violation of the Act will be found only when these principles are frustrated. Mere technical deviations from the Act or even a number of them are insufficient." *United States v. Bearden*, 659

10

F.2d 590, 601 (5th Cir. 1981) (internal quotation and citations omitted). "The underlying concern, then, is that the methods used must not result or have the potential to result in discrimination among cognizable groups of prospective jurors." *Bearden*, 659 F.2d at 602. Although the methods used by a clerk in selecting a jury may be "statistically nonrandom," there must be a "showing they either allowed discriminatory selection of jurors or otherwise prevented jury panels from consisting of fair cross sections of the community." *Bearden*, 659 F.2d at 602.

*B. Distinguishing Statutory Violations from Sixth Amendment Violations*

¶20    In contrast to an alleged statutory violation requiring an inquiry of substantial compliance, a defendant alleging a violation of the constitutional fair cross-section requirement—a related but distinct claim—must make a prima facie showing

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979). Our precedent has recognized the three criteria set out in *Duren*. In *State v. Bradley*, 262 Mont. 194, 864 P.2d 787 (1993), we held:

> Bradley advances a nebulous argument concerning the District Court's failure to have jury summonses personally served on Native Americans who had been served by mail and had failed to appear. He apparently argues that the District Court's failure to order personal service excluded Native Americans from the pool of prospective jurors, violating his constitutional right to a jury drawn from a representative cross-section of the community under *Duren* and constituting purposeful discrimination based on race under *Whitus v. Georgia*, [385 U.S. 545, 87 S. Ct. 643 (1967)]. We disagree.

11

> To establish a prima facie case under either *Duren* or *Whitus*, a defendant is required to show a statistical discrepancy between the percentage of prospective jurors and persons in the community who are members of the allegedly excluded class. *Duren*, 439 U.S. at 364, 99 S. Ct. at 668; *Whitus*, 385 U.S. at 550-51, 87 S. Ct. at 646-47. Bradley has failed to make any showing that the pool of prospective jurors contained an inadequate representation of Native Americans. Thus, based on the record before us, we cannot conclude that Bradley's right to a jury drawn from a cross-section of his community was violated or that discrimination based on race occurred.

*Bradley*, 262 Mont. at 200, 864 P.2d at 791; *see also Kills on Top v. State*, 273 Mont. 32, 56, 901 P.2d 1368, 1384 (1995) ("In addition to two other factors, in order to establish a prima facie case that his jury was not drawn from a fair cross-section of the community, Appellant must show a statistical discrepancy between the percentage of prospective jurors and persons in the community from the allegedly excluded class.") If a prima facie case is made, the State can rebut by showing "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Duren*, 439 U.S. at 367-68, 99 S. Ct. at 670. And while intentional discrimination is relevant to an equal protection claim that might typically accompany an unfair cross-section claim, it is not itself an element of a Sixth Amendment fair cross-section challenge. *Duren*, 439 U.S. at 368 n.26, 99 S. Ct. at 670. In *LaMere*, this Court did not apply the prima facie criteria for an alleged constitutional violation because LaMere alleged only a statutory violation.

¶21 The distinction between an alleged constitutional Sixth Amendment violation, which requires a defendant to make a prima facie showing under *Duren* that a distinctive group was underrepresented through systematic exclusion, and an alleged violation of the

12

jury selection statutes is significant. To reverse for substantial noncompliance resulting from a statutory violation, the interests protected by the Sixth Amendment must be implicated. Hillious alleges only statutory error. Hillious maintains, and several district courts of this state have reasoned, that *any* violation of the jury selection statutes draws into question the random and objective selection process of the jury and amounts to structural error requiring reversal. As seen, however, our precedent and decisions from other courts inform us that, unlike an alleged constitutional violation which necessarily affects the random selection of a jury, not every statutory violation requires reversal—there are statutory violations that do not affect randomness. Thus, although Hillious does not have to establish a prima facie case under the *Duren* constitutional standard, he does have to show that the statutory error affected the random selection of his jurors and that the determination of juror excuses, disqualifications, and exclusions was based on subjective criteria. *LaMere*, ¶ 57. This is the substantial noncompliance standard for demonstrating a statutory error requiring reversal that we articulated in *LaMere*.

*C. Jury Questionnaire Nonresponders*

¶22    In returning to the question post-*LaMere* of the impact of *this particular* statutory error*, which is quite distinguishable from the error in *LaMere*, we once again are informed by federal jurisprudence and decisions of our sister states in assessing the error. The question is whether, despite the statutory error alleged here, there was nonetheless substantial compliance with Montana's jury selection statutes so that the random selection of jurors and their removal based on objective criteria is not drawn into question.

13

¶23  Challenges to the formation of a jury whenever a large fraction of the potential jurors have completed and returned their questionnaires have consistently been rejected by state and federal courts.  Under the JSSA, a juror failing to complete the qualification form *may* be summoned by the clerk to appear or fill out the form, but courts have rejected that Congress intended to "command the district court clerks to operate federal jury selection as a true system of conscription."  *United States v. Gometz*, 730 F.2d 475, 480 (7th Cir. 1984).  Judge Posner, writing for the Seventh Circuit, explained:

> Most district court clerks lack the resources to issue thousands of summonses every year to persons who do not return juror qualification forms, and then to follow up on all the summonses that are ignored; nor should our overworked district judges be required to cite nonresponders for contempt. And anyone with experience as a trial judge knows that a person forced against his will to serve on a jury is apt to be an angry juror and that an angry juror is a bad juror.  These considerations increase our reluctance to infer from the provision empowering court clerks to follow up on nonresponders a legislative intent that the power must be used to eliminate possible nonresponse bias.  The provision would seem to have, as we have suggested, the more modest function of enabling the jury system to be preserved in the unusual situation where the response rate is so low that there are not enough responders to stock the juries required for trials in the district.

*Gometz*, 730 F.2d at 480-81.  The court rejected Gometz's argument that a certain personality type is bound to be underrepresented on the qualified jury wheel when some people do not return their juror qualification forms, namely the "'anti-authoritarian' personality, who thumbs his nose at the law and is therefore likely to ignore the requirement . . . of completing and returning the form." *Gometz*, 730 F.2d at 478.  Nothing in the JSSA, the court observed, suggests Congress intended a cross-section of the community, to be fairly representative, must include anti-social elements in the

14

community. Without an evidentiary connection between a low rate of response to juror questionnaires which would lead to underrepresentation of a group entitled to be a potential juror, the Sixth Amendment fundamental right to a fair and impartial jury, realized in part through the JSSA, is not violated.

¶24 In *State v. Martel*, 689 A.2d 1327 (N.H. 1997), the defendant made several allegations that the state jury selection statutes had been violated; however, as here, he alleged statutory violations and not a deprivation of his rights under the state or federal constitutions. Martel alleged the clerk's failure to direct prospective jurors who did not return completed qualification forms to appear at court to fill out the form was a substantial departure from statutory mandate. As here, the jury selection statute *required* the clerk to direct prospective jurors who have not completed their questionnaires to appear at court to complete the forms. *Martel*, 689 A.2d at 1329. The statute contained penalty provisions which supported that the language was mandatory and not merely directive. The Supreme Court of New Hampshire agreed that the jury selection statute had been violated; however, the court concluded that the statutory noncompliance did not rise to a substantial level because the purpose of the statute—the random selection of jurors from a fair cross-section of the community—was not contravened. *Martel*, 689 A.2d at 1329-30. The violation "offended neither the underlying purposes of the statute nor the defendant's rights to due process or an impartial jury under our State Constitution. . . . Without a showing of prejudice, the defendant's purely statutory argument must fail." *Martel*, 689 A.2d at 1330.

¶25 The Ninth Circuit, in *United States v. Santos*, 588 F.2d 1300 (9th Cir. 1979), similarly rejected an argument that a clerk's failure to follow-up with nonresponders was substantially noncompliant with the random and objective statutory criteria, reasoning that although the statute provides for discretionary follow-up by the clerk, "the clerk apparently believed that an 87% response to the questionnaire was sufficient." *Santos*, 588 F.2d at 1303. More recently, in *United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014), the court reiterated that the two underlying goals of the JSSA are the "random selection of prospective jurors 'from voter lists' and exclusions of prospective jurors 'on the basis of objective criteria only.'" *Hernandez-Estrada*, 749 F.3d at 1166 (quoting *United States v. Nelson*, 718 F.2d 315, 318 (9th Cir. 1983)). Hernandez argued the JSSA was violated by using outdated text in the English proficiency question on its prospective juror questionnaire and, as a result, wrongly excluded prospective jurors. Despite the government's concession of the statutory error, the court concluded that the outdated text on the questionnaire did not violate the "qualitative aspect of the Jury Selection Act, because no subjective criteria seeped into the district's qualification determinations." *Hernandez-Estrada*, 749 F.3d at 1168. Thus, "[w]hether the wording was correct or not, prospective jurors who answered 'no' were uniformly disqualified—an objective determination premised on each respondent's professed English-language abilities and not on subjective considerations." *Herandez-Estrada*, 749 F.3d at 1168.

¶26 Similarly, in *United States v. Blair*, 493 F. Supp. 398 (D. Md. 1980), defendants challenged the clerk's practice of dropping excess names from the end of jury lists, which

resulted in the exclusion of persons whose last names began with "X," "Y," and "Z." *Blair*, 493 F. Supp. at 410. While statistically nonrandom, the court held it did not exclude a cognizable group or result in an unrepresentative selection of jurors. *Blair*, 493 F. Supp. at 410. In *United States v. Smith*, 588 F.2d 111 (5th Cir. 1979), the Fifth Circuit held that the clerk's practice of putting the names of persons who had served more than two years previously back on the qualified jury wheel did not affect the inherently random nature of the selection process, because jury panels were still selected at random from a large group of persons. *Smith*, 588 F.2d at 115.

*D. Montana Precedent*

¶27 In *LaMere*, this Court reversed LaMere's conviction for mitigated deliberate homicide because the clerk used a telephone to summon 101 jurors for court from a computerized random selection of 200 names. LaMere did not object to the computerized random selection of the prospective jurors but objected to the clerk's use of the telephone to summon them. *LaMere*, ¶ 4. This Court specifically rejected the State's request to apply *Duren*'s three-pronged test for establishing a prima facie violation of the Sixth Amendment's fair cross-section guarantee, concluding that "LaMere's challenge arises under the substantial compliance standard, not the Sixth Amendment itself." *LaMere*, ¶ 62. We criticized the State for urging application of the *Duren* standard because it would "misapply the constitutional test to an alleged statutory violation." *LaMere*, ¶ 62. However, we then automatically applied a structural error analysis to the alleged statutory violation, reasoning:

17

> *[A]n automatic rule of reversal should prevail because errors in the jury selection process are "structural" in nature and, therefore, affect the very framework within which a trial proceeds. That is, they are errors which indelibly affect the essential fairness of the trial itself.* Since such errors precede the introduction of any evidence at trial, the very premise of harmless error review—that a so-called "trial error" can be assessed by a reviewing court for prejudicial impact relative to the other evidence introduced at trial—is absent. Therefore, to engage in harmless error review of a statutory violation in jury selection merely invites abstract and unguided speculation about the possibility of prejudice in an individual case; it is pure conjecture as to whether a properly selected jury would have decided a case differently than an improperly selected jury actually decided the case. . . .
>
> *[T]his Court finds a per se rule of reversal appropriate as a matter of public policy.* Montana statutes governing the procurement of a trial jury exist to secure rights deemed fundamental to our system of jurisprudence by minimizing and, indeed, preempting the violation of such fundamental rights from the outset of a trial. The *substantial compliance* standard vindicates not only the rights of the individual defendant, but also the rights of the public in ensuring that the jury system remains inviolate.

*LaMere*, ¶¶ 26-27 (emphasis added). An automatic rule or per se rule of reversal for statutory violations is inconsistent with substantial compliance review, which allows for convictions to be upheld where there is only a technical statutory violation. What is clear from the foregoing excerpt, as well as other language in *LaMere*, is that this Court confused the analysis for substantial compliance. If there is substantial *noncompliance*, then the error is structural, a per se rule of reversal applies, and a defendant does not have to show prejudice. If the error is technical, however, and there is substantial compliance because the error has not affected the randomness or objective criteria of the cross-section, then there is no automatic per se rule of reversal. The confusion created by *LaMere* has resulted in trial courts erroneously finding structural error and applying a per se rule of reversal to technical violations of the jury selection statutes. Structural error based on a jury selection

18

statutory violation requires the selection process be substantially noncompliant; that is, a defendant must show that the error affected the random selection of his jury and that the determination of juror excuses, disqualifications, and exclusions was based on subjective criteria. *LaMere*, ¶ 57. To the extent *LaMere* has language that suggests a technical violation—one not affecting random selection or objective criteria for excluding a juror— is structural error requiring reversal, we clarify that this is an improper analysis.

¶28 Nonetheless, LaMere established through statistical evidence that the statutory violation rendered his jury selection process substantially noncompliant.[2] The clerk's practice of using a telephone to summon prospective jurors excluded households with no phone service and thus a disproportionate number of below poverty households that included Native Americans, Asian Americans, and other racial or ethnic groups were excluded from the jury pool. *LaMere*, ¶ 7. The clerk's actions in contacting only those jurors with telephones did not substantially comply with the jury selection statutes because it affected the random selection of jurors and was based on subjective criteria.[3] *LaMere*,

---

[2] In *LaMere*, statistical evidence was necessary to demonstrate that an identifiable group did not have phone service. However, statistical evidence may not be necessary where, for example, it could be shown that an identifiable group associated with a zip code was not summoned, such as residents of an Indian reservation. In such a situation, the connection between the zip code and the excluded demographic would likely not demand statistical evidence.

[3] The Dissent focuses on the "notice and follow-up personal service" requirements of the statute, maintaining "a violation of either materially undermines" random selection and constitutes subjective selection. Dissent, ¶ 107. We never held in either case that a juror's "self-exclu[sion] by not responding to the notice" resulted in a random selection error. Dissent, ¶ 107. The Dissent misconstrues *LaMere* and *State v. Highpine*, 2000 MT 368, 303 Mont. 422, 15 P.3d 938, as requiring follow-up personal service, maintaining it is critical to the inquiry when, in fact, the critical component of the inquiry in both cases was the clerk's affirmative action in telephoning potential jurors. This action meant that only jurors with phones would be summoned, which resulted in the exclusion of an identifiable group from the jury pool, namely Native Americans,

¶¶ 72-75. We agree with the result reached in *LaMere* to the extent this Court held that a failure to *substantially comply* with Montana statutes governing the procurement of juries cannot be treated as harmless error and constitutes structural error; but we conclude *LaMere*'s analysis which established a per se rule of reversal for a statutory violation was incorrect and should be clarified.

¶29    In *State v. Bearchild*, the ship was somewhat righted when the Court, although acknowledging *LaMere*, concluded that a harmless error analysis should apply to a technical statutory violation where there has been substantial compliance and, therefore, no structural error. *Bearchild*, ¶ 28. Bearchild did not challenge the cross-sectional composition of the jury, nor even the impartiality of the jury. *Bearchild*, ¶ 21. Bearchild did not allege the entire jury pool was affected by the error as in *LaMere*; rather he alleged a statutory violation in that the court excused a juror pretrial before the issue had been "tried" by the court, in violation of § 46-16-115(1), MCA. *Bearchild*, ¶¶ 9, 14. We reaffirmed that where there is a failure to substantially comply with the jury selection statutes, the error is structural and requires reversal. However, if the error is technical and not structural, harmless error applies and the error must be disregarded absent a showing of prejudice. "Prejudice will not be presumed where the record shows the district court's error affected neither the constitutional or jurisdictional rights of the defendant, and the defendant on appeal has failed to demonstrate prejudice to his substantial rights resulting

---

Asian Americans, and other racial or ethnic groups who did not have telephones. We have never held, in *LaMere*, *Highpine*, or otherwise, that the failure of notice and personal service results in the exclusion of an identifiable group.

20

from the error." *Bearchild*; ¶ 24; § 46-20-701, MCA. We concluded that Bearchild had not demonstrated prejudice to his right to an impartial jury under a harmless error analysis.

*E. Hillious's Claim*

¶30  Applying these principles to the instant case, Hillious does not allege a constitutional deprivation of his right to a fair and impartial jury; Hillious alleges only a statutory violation of Montana's jury selection statutes. Thus, we must first consider the error under a substantial compliance standard; Hillious may prevail only if he demonstrates the statutory violation affected the random selection of his jury or that juror exclusions were based on subjective criteria. *LaMere*, ¶ 57. Hillious has shown neither. We agree with the District Court that there is no evidence upon which we can conclude that personal service on nonresponders would advance the goal of ensuring a random selection process. There is likewise no assurance that the sheriff could affect service on nonresponders and be successful enough to advance the goal of random selection. Most importantly, Hillious has not established that failure to return juror questionnaires is associated with the exclusion of an identifiable group of persons who are entitled to be included in the pool of potentially qualified jurors but have systematically been excluded based on subjective criteria. Critically, Hillious failed to make any analytical connection between exclusion of nonresponders and exclusion of an identifiable group of persons which would have violated a fair cross-section. Hillious relies solely on the statutory violation to assert a per se rule of reversal and structural error. The nonresponders had already been lawfully served with written notice and the record is devoid of any logical or evidentiary connection which

would support a conclusion that following up with personal service would increase the random nature of the selection. It is apparent that the intent of the personal service requirement is to ensure that there are enough jurors present to enable a jury to be selected––not to ensure that every person served must appear.

¶31 Finally, for the same reasons, this Court also concludes any statutory error was technical and harmless. Hillious has not demonstrated prejudice by showing that the violation affected the random selection of the jury pool or that jurors were excluded from the pool based on subjective criteria. Hillious, and other defendants pursuing claims related to the instant statutory violation, are attempting to have their convictions reversed without any showing that the statutory error affected their constitutional right to a fair and impartial jury.

¶32 Clearly statutory compliance should be encouraged, and it may have been prudent pretrial to vacate and reconstitute jury pools. Clerks charged with the task of executing Montana's jury selection statutes bear a heavy responsibility in maintaining and assuring the integrity and substance of the jury system. They have the duty and opportunity to ensure that juries will consist of a selection made at random, from representative sources of persons reflecting a normal cross-section of the population. Without strict adherence to the legislatively prescribed jury selection procedures, the purposes of the statute and the defendant's constitutional rights could be violated. However, under substantial compliance review and harmless error analysis, Hillious has failed to demonstrate that the clerk's

failure to comply with statutory procedure resulted in a violation of his right to a fair cross-section of the jury from which he suffered prejudice to his substantial rights.

¶33     2. Whether Hillious's untimely objection and motion for new trial was supported by good cause or in the interest of justice

¶34     The foregoing analysis also informs our decision regarding the timeliness of Hillious's motion for new trial.  The State argues that Hillious's motion for new trial was untimely because the jury issued its verdict on January 14, 2022, and Hillious waited until October 6, 2023—a total of 630 days—before filing the motion.  Because Hillious failed to raise his challenge to the jury panel prior to trial, the State contends he forfeited this claim.  The State points further to the 30-day timeframe within which a defendant must file a motion for new trial following a guilty verdict.  *See* § 46-16-702(2), MCA.

¶35     Hillious responds that he has good cause to bring an untimely objection under § 46-16-112, MCA, which provides that "[a]ny objection to the manner in which a jury panel has been selected or drawn must be raised by a motion . . . made at least five days prior to the term for which the jury is drawn" unless good cause is shown.  Despite missing the 30-day window to file a motion for new trial following a guilty verdict, *see* § 46-16-702, MCA, Hillious asserts further that it is in the interest of justice to grant him a new trial on account of the clerk's error because it affected the structural fairness of the proceeding. *See State v. Morse*, 2015 MT 51, ¶ 23, 378 Mont. 249, 343 P.3d 1196 (quoting *State v. Brummer*, 1998 MT 11, ¶ 46, 287 Mont. 168, 953 P.2d 280) ("the right of the defendant to move for a new trial does not affect the court's inherent power to order a new trial sua sponte when required in the interest of justice").

23

¶36 Hillious learned of the clerk's jury selection practices in September 2023, when the Eleventh Judicial District Court entered an order vacating trial in another case due to the same error of the clerk in randomly selecting only those jurors who returned their questionnaires. Hillious argues that we should consider the timeliness of his motion based on when he acquired the means of knowledge to discover that the clerk did not comply with § 3-15-405, MCA's requirement that she certify a list of nonresponding prospective jurors to the sheriff. Hillious relies on *Solberg v. Yellowstone County*, 203 Mont. 79, 659 P.2d 290 (1983), and other civil cases, for the proposition that the timing and means of his knowledge of the error should be dispositive. *See Solberg*, 203 Mont. at 83, 659 P.2d at 292 (quoting *Dvorak v. Huntley Project Irrigation Dist.*, 196 Mont. 167, 172, 639 P.2d 62, 65 (1982)) ("[I]f counsel does not have the knowledge, or means of knowledge, of the irregularity in the drawing of the jury . . . until after the verdict, the question may be raised for the first time on motion for new trial."). Because he discovered the clerk's deviation from the statute 17 months into his appeal, Hillious maintains that good cause supported his motion for new trial and it should be considered in the interest of justice under § 46-16-702, MCA. The State does not dispute that Hillious did not learn of the infirmity until the clerk's practices came to light in another case. However, the State maintains nothing prevented Hillious or his counsel from inquiring before trial about the clerk's process to ascertain whether it complied with § 3-15-405, MCA.

¶37 Section 46-16-702(1), MCA, provides that "following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice." The

24

court may order a new trial "without a motion or . . . after motion and hearing." Section 46-16-702(1), MCA. However, a "motion must be filed by the defendant within 30 days following a verdict or finding of guilty." Section 46-16-702(2), MCA.

¶38 Section 46-16-702, MCA, is a criminal statute contained in the criminal procedure section of the code pertaining to criminal trials. Hillious's reliance on civil cases to create an exception to § 46-16-702's requirement for a timely motion in criminal cases is misplaced. Neither Hillious's proceedings, nor any other proceeding related to the jury selection error addressed here, warrant a "knowledge or means of knowledge" exception to the requirement that a new trial motion and a challenge to the jury be timely made. Defense counsel in *State v. McCarty* inquired into the clerk's practices for selecting a jury prior to the commencement of trial and a new jury was constituted. Likewise, in cases involving the same violation in Cascade County, defense counsel raised the issue prior to trial, thus indicating there was a means for discovering the defect prior to trial.

¶39 Other state jurisdictions have consistently and uniformly held that the time requirements in their criminal statutes for challenging a jury selection must be strictly enforced. See *Kirdoll v. State*, 496 P.2d 1396 (Kan. 1972) (concluding that an orderly administration of justice required a criminal defendant to challenge the array of prospective jurors prior to voir dire and that failure to challenge resulted in a waiver of his right to challenge at a later time); *People v. Gratz*, 192 N.W.2d 304 (Mich. Ct. App. 1971) (establishing that when a defendant makes a timely challenge to an array, an evidentiary hearing can be held to establish the validity of the challenge); *People v. Dixon*, 552 N.W.2d

25

663 (Mich. Ct. App. 1996) (finding a challenge to a jury array waived because it was made after the jury had been impaneled and sworn). Importantly, time requirements do not foreclose other post-judgment or collateral relief which may otherwise be available for a criminal defendant to raise constitutional irregularities in the trial court proceedings.

¶40 Moreover, an important consideration of the timeliness of Hillious's motion is that Hillious cannot demonstrate that granting him a motion for new trial is in the interest of justice because the clerk's error did not affect the structural fairness of the proceeding. Hillious cannot demonstrate that a new trial would be in the interest of justice because, as we have determined, the jury selection procedure for his trial substantially complied with Montana's jury selection statutes and Hillious has failed to demonstrate any prejudice under harmless error review to his substantive rights. Based on our determination that there was substantial compliance with the jury selection statutes, it is not necessary to assess further whether the interest of justice warrants allowing an untimely filing based on a defendant lacking "knowledge, or the means of knowledge." This is bolstered by the fact that defense counsel, as has already been demonstrated in several of the cases where the jury selection error was noted pretrial, had the means of discovering the irregularity prior to trial. *See Davis v. United States*, 411 U.S. 233, 243, 93 S. Ct. 1577, 1583 (1973) (adopting the district court's observation that "[p]etitioner offers no plausible explanation of his failure to timely make his objection to the composition of the grand jury. . . . No reason has been suggested why petitioner or his attorney could not have ascertained all of the facts necessary to present the objection to the court [of the manner in which the grand

26

jury was drawn] prior to trial."); *Bearden*, 659 F.2d at 597 ("Defendants are entitled to inspect jury records and other papers during the preparation of the motion and are given reasonable time to otherwise investigate possible violations. . . . Violations which are discovered or could have been discovered during this investigatory stage must be alleged in the motion and sworn statement, and failure to do so will preclude their assertion either at the evidentiary hearing or at any later point.").

¶41 Nor did Hillious timely raise his challenge to jury formation as required by § 46-16-112(1), MCA. A claimed violation of constitutional rights, like any other claim, is subject to waiver or forfeiture if not timely made. *See State v. Hamilton*, 2018 MT 253, ¶ 17, 393 Mont. 102, 428 P.3d 849; *State v. Allen*, 2016 MT 185, ¶ 15, 384 Mont. 257, 376 P.3d 791. Section 46-16-112(1), MCA, sets forth when a defendant is to challenge the formation of the jury panel. It provides:

> Any objection to the manner in which a jury panel has been selected or drawn must be raised by a motion to discharge the jury panel. Except for good cause shown, the motion must be made at least 5 days prior to the term for which the jury is drawn.

¶42 This Court has not made an exception to the statute's requirement that a challenge to the jury be made pretrial, and we will not do so here. In *LaMere* and its progeny, the challenges to the jury selection procedure were timely made pretrial. The United States Supreme Court, addressing the waiver provisions of Rule 12(b)(2) in the context of a challenge to a jury, has said:

> The waiver provisions of Rule 12(b)(2) are operative only with respect to claims of defects in the institution of criminal proceedings. If its time limits are followed, inquiry into an alleged defect may be concluded and, if

27

necessary, cured before the court, the witnesses, and the parties have gone to the burden and expense of a trial. If defendants were allowed to flout its time limitations, on the other hand, there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying the raising of the claim in hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult.

*Davis*, 411 U.S. at 241, 93 S. Ct. at 1582. This Court concludes § 46-16-112(1), MCA, governs by its terms the manner in which claims of defects in the institution of criminal proceedings may be waived. Hillious has, therefore, waived any claim he can make to the composition of the jury. As these proceedings involve only Hillious's motion for new trial, we do not address whether the filing of a new trial motion may displace the five-day time requirements of § 46-16-112(1), MCA. Further, we do not deem the instant proceedings would warrant a finding of good cause to deviate from the provided time constraints as there was substantial compliance with the jury selection statutes in Hillious's trial. We therefore do not consider whether the circumstances here justify consideration of a defendant's lack of knowledge or means of knowledge as an exception to the requirement that motions in criminal trials be timely made.[4]

---

[4] Hillious also argues that the word "term" in § 46-16-112, MCA, encompassed the jury pool whose notices were sent in July 2021 and that, therefore, he could not have known of the irregularity because there was no trial at that point. We do not read the statute so narrowly, as it is unreasonable to expect a person to challenge the method of drawing potential trial jurors at a time when they may not know when or if there will be a trial, may not have trial counsel in place, or may not even have been charged. "Montana law requires a court's interpretation of a statute to be reasonable." *Pennell v. Nationstar Mortg., LLC*, 2022 MT 235, ¶ 17, 410 Mont. 526, 520 P.3d 796 (citing § 1-3-233, MCA). The statute addresses objections "to the manner in which a jury *panel* has been selected or drawn" and directs the court to discharge the "*panel*" and order "the selection or drawing of a new *panel*" if the manner was improper. Section 46-16-112(1), (4), MCA

¶43    *3. Whether Hillious is entitled to a new trial because the District Court erroneously admitted testimonial hearsay in violation of his right to confront witnesses.*

¶44    Hillious argues that the District Court abused its discretion when it admitted various out-of-court statements Amanda made before her death. First, he disputes the District Court's admission of the TOP petition. Hillious sought to exclude the TOP petition in his pretrial motion in limine. The State maintains that because defense counsel stated there was "no objection" to the petition at trial, he waived the issue on appeal.

¶45    Although a defendant generally must make a contemporaneous objection to preserve an issue for trial, "we have permitted a motion in limine to preserve an issue on appeal when the district court is 'directly faced with the question' and has provided a 'definitive ruling' on the issue." *State v. Byrne*, 2021 MT 238, ¶ 20, 405 Mont. 352, 495 P.3d 440 (quoting *State v. Favel*, 2015 MT 336, ¶¶ 19, 21, 381 Mont. 472, 362 P.3d 1126). In its order on Hillious's motion in limine, the District Court wrote that "specific rulings" on the admissibility of the TOP petition were "deferred until trial." It follows, the State

(emphases added). The language reasonably may be interpreted to apply to the term for which the jury panel in a particular case has been drawn. This interpretation finds additional support by reference to § 46-16-114(1), MCA, which requires the clerk of court to "make available to the parties a list of prospective jurors with their questionnaires when the names have been drawn." *See State v. Heath*, 2004 MT 126, ¶ 27, 321 Mont. 280, 90 P.3d 426 (observing that "statutes must be read and considered in their entirety and the legislative intent may not be gained from the wording of any particular section or sentence, but only from a consideration of the whole[]"). Under any interpretation, the statute requires an objection to be levied before trial, not many months later. Even if Hillious reasonably could not have filed his objection within five days before the September-February jury term for which the challenged notices were sent, he had the means to do so before trial. All counsel for criminal defendants may investigate formation of the jury panel for the specific case before trial, just as the lawyers in *Brown* and *Hinkle* did. Like defense counsel in those cases, Hillious's counsel could have inquired into the clerk's method for drawing his jury panel at any time before or within 30 days after the trial concluded.

contends, that the District Court did not issue a definitive ruling on Hillious's objection to the TOP petition. *See Byrne*, ¶ 20. Hillious went on to use portions of the TOP petition at trial, which the State characterizes as further indication that he waived his objection.

¶46 Hillious responds that the District Court did issue a definitive ruling because it wrote "the entirety of the TOP petition is nontestimonial and therefore admissible into evidence with a proper foundation." The District Court directly faced the question of the petition's admissibility, Hillious asserts, in part because defense counsel argued that the petition was "absolutely testimonial without an exception" at the motions hearing. Hillious maintains that after the District Court indicated it would admit the TOP petition, his use of it at trial did not constitute a waiver of his objection but was a matter of trial strategy to address evidence he knew would be admitted.

¶47 Despite reserving ruling on any foundational issues or specific hearsay exceptions, the District Court issued a definitive ruling when it ruled that the TOP petition was nontestimonial. Hillious's motion in limine and defense counsel's objection at the hearing also put the question squarely before the court. In the motion, Hillious wrote that he sought "to suppress any and all Statements made by Amanda . . . [i]n her application for temporary order of protection." Where reiterating an objection would be redundant of a motion in limine, a party need not make a contemporaneous objection at trial. *See Anderson v. BNSF Ry.*, 2015 MT 240, ¶ 77, 380 Mont. 319, 354 P.3d 1248. Additionally, "a party may not wish to register an objection in the presence of the jury for tactical reasons, yet may wish

to preserve the objection on appeal." *Byrne*, ¶ 20 (quoting *State v. Crider*, 2014 MT 139, ¶ 19, 375 Mont. 187, 328 P.2d 612).

¶48 Once the District Court had made its intentions clear to permit admission of the TOP petition, it was not necessary for Hillious to reassert his objection at trial and bring a futile objection in front of the jury. We agree that Hillious's use of the TOP petition at trial did not waive the objection on appeal. Because the District Court definitively ruled on his objection and its reassertion would have been redundant, Hillious did not waive the objection.

¶49 Hillious contends that the TOP petition was inadmissible because it is testimonial hearsay and he did not have an opportunity to cross-examine Amanda. Hillious asserts that the District Court was wrong to find that he "waived his opportunity to cross-examine Amanda on the contents of her Petition by deliberately avoiding a hearing" when he responded to Amanda's petition by filing a petition for dissolution, which removed the order of protection case to the dissolution court, and then stipulating with Amanda to dismissal of the case before any hearing occurred. Citing *State v. Matt*, 2008 MT 444, ¶ 24, 347 Mont. 350, 199 P.3d 244, *overruled in part on other grounds*, *State v. Charlie*, 2010 MT 195, 357 Mont. 355, 239 P.3d 934, Hillious maintains that waiver of a fundamental right, such as a criminal defendant's right to confront witnesses against him, must be informed and intelligent.

¶50 Hillious also cites *State v. Pingree*, 2015 MT 187, ¶¶ 17-18, 379 Mont. 521, 352 P.3d 1086, in which we reversed the defendant's conviction for assault with a weapon

because the trial court erroneously admitted previous testimony from his wife at a hearing on her petition for order of protection arising from the same incident. Pingree's wife had filed the petition following the incident that led to his criminal charges but did not appear at the criminal trial. Even though Pingree was present at the order of protection hearing and had the opportunity to cross-examine his wife, we held that M. R. Evid. 804(b)(1)(B) did not except the former testimony from the hearsay bar because Pingree did not have the same motive he would have had to cross-examine her at his criminal trial. We explained:

> An order of protection hearing is a civil proceeding. A protective order serves to prevent further conflict between the parties. Certainly, a respondent may face criminal consequences for violating an order of protection (*see* § 45-5-626, MCA), but simply being named as respondent does not expose a respondent to criminal liability. . . .

> Conversely, a criminal case implicates a much higher risk for a defendant. The charges carry serious criminal penalties if a defendant is found guilty. A criminal conviction affects one's liberty in the most fundamental way and thus, a defendant is entitled to legal representation. . . . The consequences of a criminal prosecution provide a very different motivation for cross-examination.

*Pingree*, ¶¶ 17-18. For similar reasons, we agree with Hillious that his failure to cross-examine Amanda at a hearing in the TOP petition proceeding did not waive his hearsay objection to the petition in this case.

¶51 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). Hearsay statements are inadmissible unless they meet a hearsay exception. M. R. Evid. 802. The State does not dispute that Amanda's statements in the TOP petition are hearsay, and we agree. The prosecution offered the petition for the truth of what it asserted:

32

that Hillious threatened, physically assaulted, and previously strangled Amanda. The State does not offer a hearsay exception that would have rendered the petition admissible under evidentiary rules. Under *Pingree*, even assuming the petition could be considered for the "former testimony" exception of M. R. Evid. 804(b)(1), the absence of a similar motive renders the exception inapplicable.

¶52     Even if an exception arguably applied, "[a] hearsay statement is not unquestionably admissible just because it fits into a hearsay exception—the defendant's Sixth Amendment confrontation right remains a fundamental consideration that may not be infringed upon, state evidentiary rules aside." *State v. Laird*, 2019 MT 198, ¶ 83, 397 Mont. 29, 447 P.3d 416.

¶53     The Confrontation Clause of the Sixth Amendment, binding on states through the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1067 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amends. VI, XIV. Likewise, the Montana Constitution guarantees that a criminal defendant has a right to "meet the witnesses against him face to face." Mont. Const. art. II, § 24. "Under the Sixth Amendment Confrontation Clause, testimonial statements made out of court may not be admitted as evidence in a criminal trial against a defendant unless the declarant is unavailable to testify and the defendant had a previous opportunity to cross-examine the declarant." *State v. Porter*, 2018 MT 16, ¶ 18, 390 Mont. 174, 410 P.3d 955 (citing *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004)).

¶54 "Testimony is '[a] solemn declaration or affirmation *made for the purpose* of establishing or proving some fact.'" *State v. Mizenko*, 2006 MT 11, ¶ 11, 330 Mont. 299, 127 P.3d 458 (quoting *Crawford*, 541 U.S. at 51, 71, 124 S. Ct. at 1364, 1375). Affidavits, because they are the "functional equivalent" of ex parte in-court testimony, generally are considered testimonial under the Confrontation Clause. *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. Because "the Clause applies solely to 'testimonial *hearsay*,'" it "'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Smith v. Arizona*, 602 U.S. 779, 792, 144 S. Ct. 1785, 1796 (2024) (emphasis in original) (quoting *Davis v. Washington*, 547 U.S. 813, 823, 146 S. Ct. 2266, 2274 (2006); *Crawford*, 541 U.S. at 60 n.9, 124 S. Ct. at 1369). It follows that "a court analyzing a confrontation claim must identify the role that a given out-of-court statement . . . served at trial." *Smith*, 602 U.S. at 793, 144 S. Ct. at 1797.

¶55 To determine whether a statement is testimonial, we apply the primary purpose test, which asks if "in light of all the circumstances, viewed objectively, the primary purpose of the [statement] was to creat[e] an out-of-court substitute for trial testimony." *Staudenmayer*, ¶ 20 (internal quotation marks omitted) (quoting *Ohio v. Clark*, 576 U.S. 237, 244-46, 135 S. Ct. 2173, 2179-81 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155 (2011))). "'Where no such primary purpose exists,'" the statement is nontestimonial and its admissibility "'is the concern of state and federal rules of evidence, not the Confrontation Clause.'" *Staudenmayer*, ¶ 20 (quoting *Clark*, 576 U.S. at 245, 135 S. Ct. at 2180 (quoting *Bryant*, 562 U.S. at 359, 131 S. Ct. at 1155)).

34

¶56    We applied the primary purpose test in *State v. Porter*, where an emergency room physician took a verbal history from the victim after Porter strangled her. *Porter*, ¶¶ 2-8. Although the doctor acknowledged that "part of her role was to ensure that 'there is an accurate representation of the injuries . . . so that the patient may be able to pursue a case in court,'" we held that the victim's statements to the doctor in that case were nontestimonial because they were made with the primary purpose of obtaining medical care. *Porter*, ¶¶ 25-26.

¶57    *Porter* followed United States Supreme Court rulings that a statement is nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273; *accord Mizenko*, ¶ 23 (holding that a declarant's statement to a police officer or governmental agent is presumed nontestimonial when she "had objective reason to believe that her statement would serve only to avert or mitigate an imminent or immediate danger and the agent who received the statement had no intent to create evidence").

¶58    In contrast, the United States Supreme Court held in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527 (2009), that forensic certificates that analyzed the contents of small plastic bags seized from the defendant were testimonial. The certificates were "quite plainly affidavits," and therefore fell "within the [Confrontation Clause's] 'core class of testimonial statements.'" *Melendez-Diaz*, 557 U.S. at 310, 129 S. Ct. at 2532 (quoting *Crawford*, 541 U.S. at 51-52, 124 S. Ct. at 1364). The

35

Court reasoned that the certificates were testimonial because their sole purpose "was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Melendez-Diaz*, 557 U.S. at 311, 129 S. Ct. at 2532 (citation and internal quotation marks omitted).

¶59    Similarly, in *Bullcoming v. New Mexico*, 564 U.S. 647, 652, 131 S. Ct. 2705, 2710 (2011), the Court held that the government could not introduce a forensic analyst's out-of-court statements, contained in a forensic lab report which included a testimonial certification and offered for the truth of the matter asserted, by placing a surrogate analyst on the stand "who did not sign the certification or observe the test reported in the certification." That the certification in *Bullcoming* was unnotarized did not change its testimonial character. *Bullcoming*, 564 U.S. at 665, 131 S. Ct. at 2717.

¶60    We determined for similar reasons in *State v. Laird* that statements a pathologist made during an autopsy examination constituted testimonial hearsay even though he did not make the statements "under oath or memorialize them into a sworn writing." *Laird*, ¶ 104. We observed that there was "no ongoing emergency to address" at the time the pathologist made the statements, and he "was performing an autopsy at the request of law enforcement and methodically noting the state of [the] postmortem body while law enforcement officers observed." *Laird*, ¶ 104. The doctor's opinion that bruising on the victim's neck was "troubling," we concluded, "is functionally identical to any live, in-court testimony the State would have elicited from [him] on direct examination." *Laird*, ¶ 106.

¶61 In contrast, we found statements made with a primarily administrative purpose to be nontestimonial in *City of Kalispell v. Omyer*, 2016 MT 63, ¶ 24, 383 Mont. 19, 368 P.3d 1165. In *Omyer*, we held that driver's license suspension letters generated by the Montana Department of Justice, Motor Vehicle Division (MVD) were made for the primary purpose of administering the MVD's affairs and "not for the purpose of proving a fact at trial." *Omyer*, ¶¶ 19-24. There, the letters were nontestimonial because their primary purpose was "not to provide evidence in future criminal prosecutions but rather to notify drivers of a license suspension and to create a statutorily-mandated database of driver's license records." *Omyer*, ¶ 24.

¶62 The primary purpose of Amanda's TOP petition was to submit written out-of-court assertions of fact for use in a legal proceeding in court. *See Staudenmayer*, ¶ 20 (citation omitted). As in *Bullcoming* and *Laird*, that Amanda did not swear to the TOP petition "does not remove . . . [it] from Confrontation Clause governance." *See Bullcoming*, 564 U.S. at 665, 131 S. Ct. at 2717. The TOP petition functioned as an affidavit, which the Supreme Court has described as part of the "core class of 'testimonial' statements." *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. The petition's primary purpose was not to "avert or mitigate an imminent or immediate danger," *Mizenko*, ¶ 23, but to prevent future assaults. Amanda's detailed petition shows that her principal aim in seeking the order was to keep Hillious from stopping her plan to go see her mother in Oregon. It did not serve a primarily administrative function, which could render the petition nontestimonial. *See Omyer*, ¶ 24; *Staudenmayer*, ¶¶ 24-26. Rather, the statements in Amanda's petition "were

made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52, 124 S. Ct. at 1364 (internal citations omitted). The State does not defend the District Court's ruling that the statements in the petition are nontestimonial. We agree that the TOP petition was testimonial and inadmissible without Hillious's prior opportunity to cross-examine Amanda.

¶63 Hillious next argues that Amanda's mother, Michelle Wungluck, testified falsely that she heard Amanda tell police Hillious "pushed her up against the car and was choking her." Though he makes this argument in his discussion of testimonial hearsay, Hillious essentially contends that the District Court erred when it admitted this testimony because it was false and therefore unreliable under any hearsay exception. The State responds that it is the role of the jury, not of the trial court, to determine the credibility of trial testimony. Wungluck testified at trial, and she was available for Hillious to cross-examine. We agree that Hillious's claim that Wungluck testified falsely challenges her credibility, not the admissibility of her testimony. Credibility of a witness is for the jury to determine. *See State v. Losson*, 262 Mont. 342, 350, 865 P.2d 255, 260 (1993) (quoting M. R. Evid. 104(e), Comm'n Comments) (reasoning that "the trial judge is not required to scrutinize the credibility" of statements admitted under a hearsay exception because "'the jury is the sole judge of [the] credibility and weight' of testimony"); *State v. Gai*, 2012 MT 235, ¶ 15, 366 Mont. 408, 288 P.3d 164 (citation omitted) ("[W]hile the trial judge is tasked with determining *admissibility* of evidence, the non-offering party remains free to challenge the

38

*weight* or *credibility* of admitted evidence." (emphasis in original)). Hillious has not demonstrated error in the District Court's admission of Wungluck's testimony.

¶64 Finally, Hillious asserts that the District Court erred in admitting the text messages that Amanda sent her coworker, Sara Prangley, in April 2020. The State responds that Hillious waived his objection to the text messages because he did not specifically identify the statements he sought to exclude and because the District Court never ruled on their admissibility before trial. In reply, Hillious points to instances where he and the State identified the challenged text messages, arguing that the District Court was directly faced with and directly ruled on the question of their admissibility. *See Byrne*, ¶ 20 (quoting *Favel*, ¶¶ 19, 21). The State contends that Hillious failed to preserve his objection because the District Court did not issue a direct ruling on the issue and Hillious had "no objection" when the text messages were offered and admitted at trial.

¶65 In its order on Hillious's motion in limine, the District Court wrote that Hillious "ha[d] not provided the Court" with the statements to Prangley that he sought to exclude. "Assuming these are hearsay statements," the District Court wrote, "casting Defendant in a negative light, offered to prove the truth of their contents, the Court will consider the usual concerns—relevance, competency, authenticity—in determining their admissibility as well as their testimonial nature." The District Court did not have the Prangley text messages at the time it considered the motion in limine; its order plainly deferred a definite ruling on their admissibility until trial. Accordingly, Hillious was obligated to object to

the messages at trial to preserve his challenge on appeal. *See Byrne,* ¶ 20 (quoting *Favel*, ¶¶ 19, 21). Because he did not, we do not consider this argument further.

¶66 Having found merit in the contention that Amanda's TOP petition was erroneously admitted, we turn to the State's harmless error argument. Section 46-20-701(1), MCA, provides that a "cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." The constitutional deprivation of a defendant's right to confrontation constitutes trial error that we review for harmless error. *See State v. Martell*, 2021 MT 318, ¶ 17, 406 Mont. 488, 500 P.3d 1233 (citation omitted). If "the tainted evidence does *not* go to the proof of an element of the crime charged, and there is no other admissible evidence tending to prove the particular fact at issue," then the erroneous admission of evidence is harmless "only if the State demonstrates that no reasonable possibility exists that the admission of the tainted evidence might have contributed to the defendant's conviction." *State v. Van Kirk*, 2001 MT 184, ¶ 46, 306 Mont. 215, 32 P.3d 735. "In determining whether an error was harmless, we consider the importance of the [evidence] in the prosecution's case, whether the testimony was cumulative, and the presence or absence of evidence corroborating or contradicting the [inadmissible evidence] on material points." *Martell*, ¶ 17 (citations and internal quotations omitted).

¶67 The State maintains that other admissible evidence established the facts from the TOP petition. First, in her 911 call from April 16, 2020, which Hillious did not challenge at trial or on appeal, Amanda said she was not safe to give her address; told someone,

40

"Don't poke a hole in the tire;" asked to answer the door and insisted she would come right back; then yelled "ow" twice before the line went dead. The State notes that Hillious admitted a 911 call from the same day, in which Amanda said, "I don't know if I'm going to go home if he's going to take my phone . . . and smash it again like he did last time." Additionally, Amanda's supervisor, Mary Neuharth, testified in response to a question from defense counsel that Hillious "had strangled [Amanda] once."

¶68 The State also points to Michelle Wungluck's testimony, which involved the same facts as the incident recounted in the TOP petition. Wungluck testified that Amanda called her, crying and scared, after she and Hillious "got into a fight because she had confronted him about things she had found regarding . . . [another] woman." Wungluck testified that Amanda told her Hillious had "thrown her phone and broken her phone so that she could not contact her loved ones or the police department." Wungluck's testimony established that Amanda said Hillious had put his hands around her neck and Wungluck overheard Hillious say their disagreement "could be solved with a bullet between the eyes." Wungluck further testified that she overheard Amanda tell police that "[Hillious] pushed her up against the car and was choking her." Hillious did not object to this testimony at trial.

¶69 In reviewing for harmless error, the question is not whether the evidence is cumulative, but whether the content of the inadmissible evidence is "more compelling or deserving of greater evidentiary weight." *State v. McOmber*, 2007 MT 340, ¶ 35, 340 Mont. 262, 173 P.3d 690. Based on our review of the record, we agree with the State that

41

other evidence admitted at trial tends to prove the same facts as the TOP petition. Considering the importance of the TOP petition in the prosecution's case, the admission of evidence corroborating the petition on material points, and the other evidence the State presented—including compelling trial testimony from Amanda's children about the assault leading to her death—we conclude that "[q]ualitatively, nothing [in the TOP petition] is any more inflammatory or prejudicial than the other, admissible evidence at trial." *State v. Stewart*, 2012 MT 317, ¶ 50, 367 Mont. 503, 291 P.3d 1187. We therefore hold that the District Court's error in admitting the TOP petition was harmless.

## CONCLUSION

¶70    The statutory violation that occurred in the jury selection process did not rise to the level of substantial noncompliance and thus does not warrant per se reversal because Hillious did not show that the violation was a result of non-random or subjective criteria. He also failed to timely object to the jury's formation and neither his objection nor motion for new trial were timely; Finally, though Hillious's Confrontation Clause rights were violated by the admission of certain evidence, he has not shown that he was prejudiced by this error.

¶71    The District Court's judgment is affirmed.

/S/ LAURIE McKINNON

We Concur:
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE

Chief Justice Cory Swanson has recused himself and has not participated in this matter.

42

Justice Katherine Bidegaray, dissenting.

¶72 I dissent from the Court's decision to affirm the denial of Hillious' motion for a new trial. In my view, the District Court erroneously concluded that Hillious was required to demonstrate prejudice when challenging Flathead County's compliance with jury selection statutes and misapplied *State v. LaMere*, 2000 MT 45, 298 Mont. 358, 2 P.3d 204. The Court compounds the District Court's errors by disregarding precedent and concluding that the statutory violation here was "technical and harmless," rather than structural and per se reversible. Accordingly, the record compels reversal and grant of a new trial.

### 1. District Court's Order on Hillious' Motion for New Trial.

¶73 The District Court's order on Hillious' motion for new trial speaks to the confusion in this area of the law. The court's analysis is flawed because it relied on an outdated harmless error framework and failed to appreciate that under *LaMere*, evidence of actual prejudice is not required once substantial statutory noncompliance is established. First, the court should have granted Hillious' request for a hearing so that he could present evidence and elicit testimony regarding the specific nature and extent of the Flathead County clerk and Sheriff's alleged noncompliance with § 3-15-405, MCA. The District Court also erroneously required a showing of actual prejudice in violation of this Court's holdings in *LaMere* and *Robbins v. State (Robbins II)*, 2002 MT 116, 310 Mont. 10, 50 P.3d 134. Further, the court misapplied *LaMere* to deny Hillious' motion for a new trial and summarily concluded that Hillious failed to present evidence that the county clerk's

43

notification method affected the randomness of jury selection or excluded "an entire class of people" from his trial.

¶74    In its December 15, 2023 order, the District Court denied Hillious' motion for a new trial on the grounds that he "did not show he was prejudiced by the Clerk's alleged noncompliance" with § 3-15-405, MCA.  The court went on to state that "alleged statutory violations in the procurement of a trial jury are 'amenable to harmless error review,' because 'it is no longer presumed that simply because an error is committed it is prejudicial.'"  (Citing *LaMere*, ¶ 21.)  This reasoning misinterprets *LaMere*, which clearly holds that a structural error in the jury selection process is, by its nature, presumptively prejudicial.  The District Court stated:

> *LaMere* found reversible error because the [county clerk] used a telephone to procure a jury.  *Telephonic jury procurement was found to be prejudicial because the* "*statistics revealed* a substantial discrepancy regarding the availability of phone service between those persons living above and below the poverty line [in the county]."  In other words, the jury did not reflect the community demographics *because individuals living below the poverty line did not have phone service* in significantly greater quantities than their above-the-poverty-line counterparts. . . . *Robbins* also dealt with a telephonic jury procurement process and thus its facts are inapplicable to this case.

> .    .    .

> Not only did the clerk in *Dvorak* lack substantial compliance with the jury procurement process of the time, but both the district clerk and judge [there] lacked any compliance with the statute whatsoever.  *Solberg* dealt with the same allegations as *Dvorak*. . . . *Dvorak* and *Solberg* found reversible error in the jury procurement process because the district court engaged in comprehensive noncompliance with the statute of the time.  *Robbins* and *LaMere* found reversible error in the jury procurement process because the district court telephonically summoned juries, *which neglected to account for entire demographics of impoverished and Indigenous American persons*.

44

Here, [Hillious'] lone allegation is that "a fair cross-section of the community" was not accounted for when the Clerk allegedly failed to certify the individuals who did not respond to jury notices. In *LaMere*, the defendant presented the *affidavit of a statistician* to argue the jury that was telephonically summoned did not represent the community at large. Here, *there is no evidence demonstrating* (*or even suggesting*) *that a person of any particular age, race, color, national origin, religion, sex/gender identity, or disability is more likely than another person to fail to respond to a jury notice lawfully served by mail* and *it cannot be said that personal service of a jury notice on a person who has already been lawfully served by mail will ensure the random nature of jury selection.*

With the understanding that "[t]echnical departures from the jury selection statutes and violations which do not threaten the goals of random selection and objective disqualification do not constitute a substantial failure to comply," *where is the evidence* that the Clerk's alleged actions *preempted randomness in the selection of Defendant's jury? Where is the evidence* that "*an entire class of people*" *were excluded from the process*? As *there is none*, Defendant's Motion is DENIED.

(Emphasis added and internal citations omitted.)

¶75 The District Court's analysis reflects a fundamental misunderstanding of *LaMere*. *LaMere* was *not* decided based on statistical data tending to show prejudicial exclusion of potential jurors, and our granting a new trial in *Robbins II*, a case where Robbins did not present "any evidence that he was actually prejudiced," reinforces that fact. On the heels of our decision in *State v. Robbins (Robbins I)*, 1998 MT 297, 292 Mont. 23, 971 P.2d 359, LaMere supported his challenge to the telephone-only summons method with evidence tending to show prejudice, because that was what *Robbins I* required. *Robbins I*, ¶¶ 52-53, 58 (finding a failure to substantially comply with the statute but harmless error without evidence of "actual prejudice"). However, by overruling *Robbins I* in *LaMere*, and granting Robbins a new trial in *Robbins II*, we confirmed that evidence of prejudice is not

necessary for reversal where a defendant shows a failure to substantially comply with jury selection statutes because those types of error are structural and reversible without any additional evidentiary showing.

¶76 Contrary to the District Court's conclusion here, under *LaMere*, Hillious had to establish *only* that the Flathead County clerk and Sheriff failed to substantially comply with the requirements of § 3-15-405, MCA. The "substantial compliance" standard, as clarified in *LaMere*, renders additional statistical evidence of prejudice unnecessary.

### 2. Pre-*Robbins I* "Substantial Compliance."

¶77 Even before statehood, this Court recognized that "a panel of jurors not drawn according to law is a nullity." *Dupont v. McAdow*, 6 Mont. 226, 228-30, 9 P. 925, 926 (1886) (court erred by soliciting open venire of "twelve good and lawful men" to fill the jury panel instead of first drawing from the jury commissioner's list of eligible jurors). Long before *LaMere*, we recognized that the right to a trial by jury encompasses the right "to a panel drawn in *substantial conformity* with the requirements of" the jury selection statutes. *State v. Landry*, 29 Mont. 218, 222-24, 74 P. 418, 420 (1903) (reversible error to draw from jury boxes out of turn (emphasis added)).[1] In *Landry*, we noted that "there may be irregularities" in jury selection that could "be overlooked,"[2] "but a substantial

---

[1] In *Landry*, we applied the civil jury-selection and impaneling rules to a criminal trial because they "apply to criminal cases." *Landry*, 29 Mont. at 223, 74 P. at 420.

[2] *Landry*, 29 Mont. at 224, 74 P. at 420 (citing *State v. Tighe*, 27 Mont. 327, 71 P. 3 (1903)). In *Tighe*, jury commissioners violated jury statutes by intentionally excluding from the jury list people who were "competent" to serve as jurors, but "exempt from jury service" by law. This Court held that the violation "qualified [as] an irregularity," but did not "affect any substantial

46

compliance with the law is necessary in order to meet the constitutional requirement."

*Landry*, 29 Mont. at 224, 74 P. at 420.

¶78     In *State v. Groom*, 49 Mont. 354, 141 P. 858 (1914), we sustained the defendant's

jury challenge based on his uncontested claim that the sheriff intentionally failed to

personally summon some of the jurors drawn for his trial.  *Groom*, 49 Mont. at 356-58,

141 P. at 859.  There, we said:

> It has been held uniformly that substantial compliance is required, and anything less will vitiate the work of procuring a jury. . . .  But not every deviation, however slight, from the strict letter of the law in drawing or returning a jury will furnish ground for challenge to the panel.  The statute in terms requires that the departure must be a material one.
>
> .   .   .
>
> The right to challenge the jury panel for the intentional omission of the sheriff to serve one or more of the jurors drawn is but a *legislative amplification of the constitutional guaranty* that in every criminal prosecution the accused shall have the right to "a speedy, public trial by an impartial jury."  If the sheriff may be permitted to summon only such veniremen *as suits his whim or caprice*, he can pack the jury in any given case as effectually as though the selection of the entire jury *were left exclusively to him*.

*Groom*, 49 Mont. at 358-59, 141 P. at 859 (emphasis added).

¶79     In *State ex rel. Henningsen v. Dist. Ct.*, 136 Mont. 354, 348 P.2d 143 (1959), in an

original proceeding on a petition for a writ of prohibition, we considered whether the trial

court had substantially complied with the jury selection statutes by drawing names for the

court's term from a jury box containing capsules and slips of paper.  *Henningsen*,

136 Mont. at 355-56, 348 P.2d at 144.  The court, upon discovering an error in creation of

---

right of the defendant" because, if the excluded jurors had been summoned, the court was obligated by law to excuse them from service.  *Tighe*, 27 Mont. at 329-32, 71 P. at 5.

47

the jury lists, by necessity, added 15,000 names to the jury box, which already contained 30,000 names in sealed capsules, as required by law. The additional names, however, were not placed in capsules, but instead were added to the box on slips of paper. *Henningsen*, 136 Mont. at 355-56, 348 P.2d at 144. Noting the 40 civil and 7 criminal trials pending in the district, we stated:

> The question now before us *is not as to whether any prejudice has or may result in an individual case*, but simply *whether the letter of the law need be followed* by the district judge to protect the system of jury selection.

*Henningsen*, 136 Mont. at 357-58, 348 P.2d at 145 (emphasis added). Notwithstanding the trial court's claims that obtaining 15,000 capsules "may be either expensive or difficult," we held:

> As has been historically said, the difficult can be done immediately, the impossible takes a little longer. Although the desire of the district judge to get his jury term in progress is commendable, he still *cannot disregard the plain provisions of the legislative directive*, *enacted to protect the jury system*.

*Henningsen*, 136 Mont. at 359, 348 P.2d at 146 (emphasis added). Even the dissenting Justice Angstman "concede[d] that this court should hesitate to sanction departure in a material manner from the statutory method of drawing a jury" because "danger lies in the fact that if departure be tolerated in one respect then there is invitation to deviate in others and thus the statutory method be frittered away." *Henningsen*, 136 Mont. at 361, 348 P.2d at 146 (Angstman, J., dissenting).

¶80    In *Dvorak v. Huntley Project Irrigation Dist.*, 196 Mont. 167, 639 P.2d 62 (1981), the clerk committed numerous violations of the jury selection statutes—the jury box

contained names on slips of paper, not capsules; he did not shake the jury box prior to drawing; and he drew the names outside the presence of the judge. *Dvorak*, 196 Mont. at 170, 639 P.2d at 64. We held that "the statutory violations . . . defeated the objective of insuring random selection." *Dvorak*, 196 Mont. at 170, 639 P.2d at 64. We further stated:

> *The fact that no actual prejudice has been shown is irrelevant.* Whether a different verdict would have resulted had the statutory procedures been followed is purely speculative, conjectural and impossible to determine. The District Court went *well beyond a mere technical departure* from the jury selection statutes and this type of departure necessitates the reversal of the verdict and a retrial with a jury selected in the proper manner.

*Dvorak*, 196 Mont. at 171-72, 639 P.2d at 65 (citing *State v. Fitzpatrick*, 178 Mont. 530, 539, 569 P.2d 383, 389 (1977) ("[w]here the disregard for legislative mandates amounts to more than technical irregularity substantial compliance has not been achieved" (emphasis added)).[3]

¶81    In sum, these cases demonstrate that, pre-*Robbins I*, violations of jury selection statutes could be substantial or "merely technical departures," and that the nature of the violation dictated the remedy. And, pre-*Robbins I*, a failure to substantially comply with jury selection statutes was reversible error, without a showing of actual prejudicial impact. This principle—that a failure to adhere substantially to the statutory methods undermines the jury selection process—forms the foundation for *LaMere*.

### 3. *Robbins I*: Failure to Substantially Comply but Error Harmless Where No "Actual Prejudice."

---

[3] We reversed and remanded for a new trial in *Solberg v. Cnty. of Yellowstone*, 203 Mont. 79, 82-83, 659 P.2d 290, 292 (1983), based solely on testimony that Solberg's jury was selected "in the same manner" as the jury in *Dvorak*.

¶82 In *Robbins I*, we departed from our precedent by applying the "harmless error" standard when reviewing a proven failure to substantially comply with jury selection statutes. There, the defendant objected to the jury summoning process "[o]n the first day of trial, prior to *voir dire*." *Robbins I*, ¶ 14. The county clerk testified that she had gone down the list of 150 randomly-selected jurors, calling each by telephone to inform them they were selected for jury service. *Robbins I*, ¶ 14. "If the potential juror did not answer, did not have an answering machine, or did not return the clerk's telephone call, then that person was effectively removed from jury duty." *Robbins I*, ¶ 14.

> Robbins argued that the phone-dependent procedure employed by the clerk automatically excluded persons who could not afford a telephone or who did not otherwise have someone at home to answer the phone. Robbins further complained that the process apparently permitted the court to excuse potential jurors without noting the reason for excuse. The essence of Robbins' claim was that *the statutory requirement of a summons to court ensures that each prospective juror will personally appear in court unless properly excused by the court prior to the first day of trial*.

*Robbins I*, ¶ 15 (emphasis added). The trial court rejected Robbins' objection, "concluding that the clerk was in 'substantial compliance with the statutes.'" *Robbins I*, ¶¶ 16, 47.

¶83 On appeal, we held that the clerk's failure "to either serve by mail or to serve personally those jurors whose names had been drawn for Robbins' trial" violated § 3-15-505, MCA (1997) (now, § 3-15-405, MCA), and thus that the trial court "erred in impliedly finding substantial compliance with the statutory procedure for summoning jurors." *Robbins I*, ¶ 51. We did not mention or discuss whether the jurors who were not summoned due to the telephone-only method constituted a particular "class" of people. Instead the determinative factor was that the clerk's method violated the mail and personal

50

service requirements of § 3-15-505, MCA. *Robbins I*, ¶¶ 51-52. Upon concluding that the clerk had failed to substantially comply with the statute, we then considered whether the violation was prejudicial and reversible, or harmless and not. *Robbins I*, ¶ 52 (citing § 46-20-701, MCA (harmless error statute)).[4] We, incorrectly, as later established in *LaMere* and *Robbins II*, concluded that the error was harmless based on Robbins' failure to produce any "actual evidence" that the clerk's telephone-only summons method excluded people of "low economic and social status" and produced "a jury lacking in impartiality in [his] case." *Robbins I*, ¶¶ 52-53.

### 4. *LaMere*: Failure to Substantially Comply is Presumptively Prejudicial.

¶84 Two years later, we considered the same issue in *LaMere*. There, the defendant appealed the denial of his "motion to strike the jury panel." *LaMere*, ¶¶ 2, 5. During a pretrial conference on August 7, 1997, the trial court ordered the clerk to "pull[]" the jurors for LaMere's criminal trial. *LaMere*, ¶ 4. The next day, the clerk pulled "200 names from the list of eligible jurors" and summoned 101 of them by telephone. *LaMere*, ¶ 4. On August 15, 1997, four days before his trial, LaMere filed a "motion to strike the jury panel," challenging the clerk's telephone-only summoning method, "and requested a hearing on the matter." *LaMere*, ¶¶ 4-5. The court set a hearing on the motion for August 18, 1997, "the day before trial." *LaMere*, ¶¶ 4-5.

¶85 At the evidentiary hearing, the county clerk testified that, despite § 3-15-505/-405's requirement that a clerk notify the selected jurors by mail and certify non-responders to the

---

[4] Section 46-20-701(2), MCA, provides that, on appellate review, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."

Sheriff for personal service, she instead summoned the potential jurors by telephone only and did not certify the non-responders to the Sheriff for personal service. *LaMere*, ¶¶ 4-5, 9-10, 15, 70. LaMere, a Chippewa Cree, also presented evidence at hearing, including statistical data showing that Native Americans were disproportionately represented among county residents without telephones, and a statistician's opinion that the phone-summoning method was biased because it excluded households without telephones, which tended to be below poverty level. *LaMere*, ¶¶ 6-9. The District Court denied his motion. *LaMere*, ¶ 11.

¶86    On appeal, we noted that, "[l]ike the defendant in *Robbins*, LaMere relie[d] principally upon § 3-15-505, MCA (1997)." *LaMere*, ¶ 15. Therefore, as in *Robbins I*, we held that the clerk's telephone-only notification method did not "substantially comply" with the statute. *LaMere*, ¶¶ 15-17 (citing *Robbins I*, ¶ 51 (Robbins' clerk "failed to either serve by mail or to serve personally" jurors drawn for his trial)). However, we diverged from and overruled *Robbins I* to the extent it required a showing of "actual prejudice" resulting from a failure to substantially comply with the statute. *LaMere*, ¶¶ 18-20, 25-27, 66; *Robbins I*, ¶ 53. We did this because (1) jury selection statutes embody and secure a defendant's fundamental constitutional fair trial right to an impartial jury; (2) failure to substantially comply with those statutes violates constitutional random selection and objective exclusion requirements (the fair-cross section guarantee); (3) an improperly selected jury is a "structural" error that, among other things, affects the "framework within which the trial proceeds"; and (4) "structural" errors are presumptively prejudicial and therefore not amenable to harmless error review. Therefore, because a jury selection error

that "transgress[es]" the fair cross-section guarantee is "structural" in nature, once established, the error is presumptively prejudicial and per se reversible. *LaMere*, ¶¶ 39, 51-53, 66.[5]

¶87 A close reading of *LaMere* reveals that we did not reference or rely on LaMere's statistical evidence of prejudice in our substantial compliance analysis and holding. *See LaMere*, ¶¶ 70-75. *Compare LaMere*, ¶¶ 5-8, 12; Opinion, ¶ 27.[6] Instead, we noted that

---

[5] In *LaMere*, we also noted the distinction between an asserted statutory violation, and constitutional claims "aris[ing]" out of "the Sixth Amendment itself." *LaMere*, ¶ 62. There, the State "urge[d]" this Court to apply *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664 (1979), which we declined to do because it "would misapply the constitutional test to an alleged statutory violation." *LaMere*, ¶ 62. We stated that:

Although the statutory procedures for jury selection are designed to protect the constitutional, fair cross-section guarantee, the substantial compliance standard and the constitutional test have as their object of inquiry entirely different subject matters. . . . [T]he constitutional, fair cross-section test exists to challenge a "*jury-selection system*" that systematically excludes an identifiable class of citizens from jury service. Here, LaMere's challenge is premised upon a material failure to comply with the statutory scheme; he is not challenging the jury-selection scheme itself as failing to comport with the Sixth Amendment. As LaMere correctly suggests, it is possible to have substantial compliance with a system for jury selection, statutory or otherwise, that nevertheless fails to satisfy the fair cross-section requirement of the Sixth Amendment. Therefore, *Duren* is inapposite to the challenge before this Court.

*LaMere*, ¶¶ 62-64 (internal citations omitted). *Accord Tribby v. Northwestern Bank of Great Falls*, 217 Mont. 196, 205-07, 704 P.2d 409, 415-16 (1985):

The jury panel selection is subject to *two separate inquiries*. The first, a procedural inquiry, is whether there was *a material deviation or departure from the statutes on jury selection*. The second, a substantive inquiry, is whether the parties *had a trial before a fair and impartial jury*. Reversible error can occur on either question. . . . The purpose of the jury selection statutes is to provide random selection of jurors from the entire panel or array, thus securing a fair and impartial jury. The jury composition may be found fundamentally unfair for reasons *other than a failure to comply with the selection statutes*, such as purposeful discrimination in selection because of race or permitting a juror who has a bias or prejudice to hear a case. [(Citation omitted; emphasis added.)]

[6] Upon renewing his motion to strike the jury during voir dire, LaMere also claimed that "he was prejudiced by the gender makeup of the venire because women—especially retired, white

the telephone-only notification method defeated the constitutional purposes of the jury selection statute in two ways. First, the clerk's failure to summon "the entire panel or array" of jurors drawn for LaMere's trial undermined the purpose of the statute to require all randomly-selected, summoned jurors to "appear in court on the slated day of trial," i.e., "receive a jury summons by mail or personal service and respond thereto." *LaMere*, ¶¶ 70-71 (instead, the notification method excluded over one-third of the 200-person pool). The clerk's subjective choice to summon by telephone interfered with and "necessarily skew[ed]" the statutory jury selection system and thereby "frustrate[d] the random nature of the selection process." *LaMere*, ¶¶ 72-73. Second, the failure to follow-up with non-responders undermined the purpose of excluding jurors based on "objective criteria." *LaMere*, ¶ 73. Telephone-only notification, without follow-up personal service, essentially allowed jurors to "shirk[]" jury service and self-excuse "simply by failing to return the clerk's phone call." *LaMere*, ¶¶ 69-71, 73-74 (noting that a "largely voluntary jury system" was something "we will not countenance"). The nature of the clerk's failure to follow the law thus "materially undermined the purpose of the jury selection statutes to provide for

---

women—were more likely to be home" during daytime working hours, "and because those prospective jurors who had been excusing themselves from possible jury service by not returning the clerk's telephone calls were mostly men." *LaMere*, ¶ 12. We never addressed the gender bias issue again. Regarding "bias," we noted only that:

> While we have no reason on the record to question the clerk's intentions in utilizing the telephone to summon prospective jurors, *processes which permit human subjectivity to influence the objective, random system often foster biased results.* Regardless of the good intentions of the persons in charge of jury selection, *their interplay with the system* necessarily skews the system.

*LaMere*, ¶ 72 (citation and internal punctuation omitted; emphasis added).

random selection of jurors on the basis of objective criteria," and LaMere got a new trial. *LaMere*, ¶ 75.

**5. *Robbins II*: Confirming that Evidence of Prejudice Is Not Determinative of Substantial Compliance.**

¶88 Two years after *LaMere*, we considered Robbins' post-conviction request for a new trial based on our *LaMere* holding that a defendant does not have to show prejudice if he establishes a failure to substantially comply with the jury selection statutes. *See LaMere*, ¶ 61; *Robbins II*, ¶¶ 6-10, 13, 16, 21. In *Robbins I*, we found the clerk's failure to substantially comply with the statute harmless where Robbins failed to present "any evidence" that the telephone-only service method excluded jurors "too poor to afford a telephone" or resulted in an impartial jury. *Robbins I*, ¶¶ 52-53. In *Robbins II*, acknowledging Robbins' prior failure to present "any evidence that he was actually prejudiced," we granted him a new trial based on our *LaMere* holding. *Robbins II*, ¶¶ 7, 13-17, 21 (applying *LaMere*, ¶¶ 50, 61).

¶89 Our *Robbins II* holding highlights a critical aspect of our *LaMere* analysis: the presence or absence of evidence demonstrating prejudice was not determinative of substantial compliance. *See LaMere*, ¶¶ 70-75; *compare LaMere*, ¶¶ 5-8, 12.[7] That's not to say that a defendant alleging a failure to substantially comply with jury selection statutes will not obtain and have ready any and all evidence of prejudice he can muster. For reasons

---

[7] *Accord State v. Lopez*, 2001 MT 97, ¶¶ 11-17, 305 Mont. 218, 26 P.3d 745 (reversing post-*LaMere* based only on telephone summoning method); *State v. Highpine*, 2000 MT 368, ¶¶ 6-8, 37-41, 303 Mont. 422, 15 P.3d 938 (reversing post-*LaMere* based on clerk's failure to follow-up with Sheriff's personal service on non-responders, not defendant's failure to show prejudice).

explained below, *he may need it* if he cannot establish that a particular alleged statutory violation constituted a failure to substantially comply with the statute, because the only way to obtain reversal on a "technical" statutory violation or deviation is by showing that the error was not harmless. However, the trial court's threshold substantial compliance inquiry *does not require* evidence of prejudice, because, if the defendant establishes a substantial failure to comply with the statute, that violation is *presumed prejudicial*.

6. ***LaMere* and *Bearchild*: Defining and Refining the "Substantial/Technical Dichotomy."**

¶90    In *LaMere*, and later in *Robbins II*, notwithstanding the presence or absence of evidence of prejudice, we held that the clerk's failure to (1) mail notice to selected jurors and (2) follow-up by having the Sheriff personally serve non-responders was a failure to "substantially comply" with § 3-15-505/-405, MCA. *LaMere*, ¶¶ 17, 25, 61; *Robbins II*, ¶¶ 7, 13-17, 21 (applying *LaMere* to grant Robbins a new trial). We then endeavored in *LaMere* "to clarify and refine upon the substantial compliance standard." *LaMere*, ¶ 25.[8] The test looks to the nature and extent of the statutory violation. *LaMere*, ¶ 56. Beyond just a quantifiable degree of compliance with the elements of a statute, the "substantial compliance" test addresses the relationship between the violation and the fundamental constitutional fair cross-section guarantee embodied in the jury selection statutes. *LaMere*, ¶¶ 32-39, 60, 68-69, 75 (violation to be "viewed in terms of the underlying principles of

_____

[8] When "refin[ing]" the "substantial compliance" standard in *LaMere*, we considered the federal JSSA standard. *LaMere*, ¶¶ 56-58.

ensuring that jury venires are selected randomly and on the basis of objective criteria").

Accordingly, we said in *LaMere*, ¶ 38, that:

> To minimize violations of the fair cross-section guarantee, *the statutory procedures establish objective methods for the random selection of trial jurors* in Montana. These objective procedures, by seeking to eliminate as far as possible *the vagaries of human subjectivity and arbitrariness* from the jury selection process, secure a defendant's fundamental right to an impartial jury by ensuring that the selection process results in a jury panel or venire consisting of a fair cross-section of the community.

¶91 This does not mean that *any* statutory violation will fail the "substantial compliance" standard or is per se reversible. *See LaMere*, ¶¶ 55, 58-61 ("the substantial compliance standard is not an absolute rule; it permits minor deviations from statutory procedure").[9] Again, the test is whether the particular violation "materially undermine[s] the purpose of the jury selection statutes to provide for random selection of jurors on the basis of objective criteria." *LaMere*, ¶ 75.

¶92 *LaMere* drew the critical distinction between a "substantial failure to comply" with a statute and a "technical violation." *LaMere*, ¶¶ 57-60. A substantial failure to comply "directly or materially affects the random nature or objectivity of the jury selection process." *LaMere*, ¶¶ 39, 60 (substantial violation of a jury selection statute equivalent to a "transgression" of the fair cross-section guarantee). Because a "substantial failure to comply" with jury selection statutes "affects the very framework within which the trial proceeds" and "pervades the entire trial process," "*independently of the . . . consequences*

---

[9] *Accord Landry*, 29 Mont. at 224, 74 P. at 420; *Tighe*, 27 Mont. at 329-32, 71 P. at 5; *Groom*, 49 Mont. at 358-59, 141 P. at 859; *Dvorak*, 196 Mont. at 171-72, 639 P.2d at 64; *Fitzpatrick*, 178 Mont. at 539, 569 P.2d at 389 (pre-*LaMere* cases also noting the substantial/technical error distinction).

*in an individual case,*" a jury selection error is "structural" and therefore presumptively prejudicial and per se reversible. *LaMere*, ¶¶ 39-50, 60 (an improperly selected jury evades harmless error review because "any inquiry into harmless error [is] impossible to discern from the record and, thus, purely speculative" (emphasis added)). Conversely, a "technical violation" of, or "deviation" from, a jury selection statute will not "frustrate" the "goals" of "protect[ing] the random nature and objectivity of the jury selection process" or "result in discrimination and arbitrariness." *LaMere*, ¶¶ 57-58; *State v. Bearchild*, 2004 MT 355, ¶ 24, 324 Mont. 435, 103 P.3d 1006 (harmless errors "affect[] neither the constitutional or jurisdictional rights of the defendant"). A "mere 'technical' or 'immaterial' violation," unlike a substantial failure to comply, is not, by itself presumptively prejudicial and therefore requires a showing of some prejudice to the defendant's substantial rights to warrant reversal. *See LaMere*, ¶¶ 55-60.

¶93    Four years after *LaMere*, *Bearchild* further refined the "substantial failure to comply"/"structural error" and "technical violation"/"harmless error" distinction. There, on the first day of trial but prior to voir dire, the State asked the trial court to excuse a potential juror for cause on the grounds that she previously worked for the county attorney's office; she was privy to information relating to prior cases the defendant had been involved in; and the prosecutor had recently fired her. *Bearchild*, ¶ 3. Bearchild objected, arguing that an in-court examination was required prior to excusal "to determine if she would be unfair to either party." *Bearchild*, ¶ 3. The trial court expressed concerned about the juror's potential for bias and to communicate with other prospective jurors, but

noted that, based on her assigned number, she would not likely become a jury member. *Bearchild*, ¶ 4. The court excused the juror. *Bearchild*, ¶ 4.

¶94 On appeal, we considered whether the trial court failed to substantially comply with § 46-16-115, MCA (governing challenges for cause). *Bearchild*, ¶¶ 8-9, 11. Noting that "[o]ur statutes are fairly explicit as to the need for an in-court examination of the juror when considering a challenge for cause," we held that the court "erred when it excused the juror[] for cause before voir dire." *Bearchild*, ¶ 14. We then set out to determine whether that error constituted a "material failure to substantially comply," and therefore a structural error requiring "automatic reversal," or a "technical departure" from the statute amenable to harmless error review. *Bearchild*, ¶¶ 9-10, 15, 18.

¶95 In considering the specific nature of the statutory violation and the rights implicated, we noted that Bearchild had not challenged "the cross-sectional composition of the jury," or its "impartiality," but instead, challenged only "a specific juror." *Bearchild*, ¶¶ 20-21 (compared to *LaMere*'s challenge to "the entire jury pool"). We then noted that while Bearchild was "entitled to an impartial jury," he had "no right to a particular juror." *Bearchild*, ¶ 21 (citing *LaMere*, ¶ 37). We also noted that, "[u]nder the federal [JSSA], it is permissible for a court to exclude a juror for . . . bias prior to voir dire." *Bearchild*, ¶¶ 12-13 (citing *United States v. Contreras*, 108 F.3d 1255, 1269 (10th Cir. 1997)).[10] We held that the court's error did not "affect [Bearchild's] right to an impartial jury" or

---

[10] *See Contreras*, 108 F.3d at 1269 ("we are aware of no authority holding a defendant's right to an impartial jury is violated per se by the pre-*voir dire* excusal of jurors"; "[i]n fact, the Jury Selection and Service Act indicates the district court may properly exclude summoned jurors prior to *voir dire* based on hardship or bias").

"threaten the goals of random selection and objective disqualification," and thus was neither a "material failure to substantially comply" with the statute or presumptively prejudicial. *Bearchild*, ¶¶ 15, 17-21, 24.

¶96     Then, because the error was "technical" in nature and "could be isolated" in the record "and assessed for its prejudicial impact," we applied the harmless error analysis. *Bearchild*, ¶¶ 15, 22, 24.  In doing so, we noted that harmless error is not only applicable to "trial error"; "it also applies to 'technical or immaterial violations' of the statutory jury selection scheme." *Bearchild*, ¶ 24 (citing *LaMere*, ¶¶ 60-61).  Turning to the record, we held that, because the excluded juror would never have sat Bearchild's jury anyway (she was number 43; the last juror questioned was number 36), Bearchild could not show that her exclusion prejudiced his right to an impartial jury. *Bearchild*, ¶¶ 22, 25-27 ("[t]he outcome of Bearchild's trial would be the same regardless of [the juror's] dismissal").  We further held that, because Bearchild did not prove that he was prejudiced by the court's erroneous exclusion, the error was harmless. *Bearchild*, ¶ 28.[11]  Accordingly, *LaMere* and *Bearchild* together establish that a failure to substantially comply with jury selection

---

[11] In addition to comparing the nature of the court's violation to the error in *LaMere*, we also compared it with the error in *State v. Good*, 2002 MT 59, 309 Mont. 113, 43 P.3d 948. *Bearchild*, ¶ 18. In *Good*, the defendant challenged two venire members for cause when they expressed a potential for bias regarding his presumption of innocence. *Good*, ¶ 12. After colloquy and attempted rehabilitation, the trial court declined to excuse the jurors and Good had to exercise two of his preemptory challenges to remove them from the jury. *Good*, ¶ 43. We held that the court had abused its discretion in denying Good's challenge. *Good*, ¶¶ 42, 53. We further held that the court's error was structural and "require[d] automatic reversal" under *LaMere* because "the impartiality of the jury is at issue when a defendant is effectively denied peremptory challenges," and "[w]hen the State has more peremptory challenges than the accused, the State has an unmistakable tactical advantage and the impartiality of the jury is compromised." *Good*, ¶¶ 57-62, 65-66.

60

statutes is structural and reversible error; whereas a technical violation is subject to harmless error review. By misidentifying the statutory violation here as "technical and harmless," the Court undermines the protective purpose of the statutory scheme.

¶97 The foregoing cases establish the following principles. Errors of constitutional dimension that "affect[] the very framework within which the trial proceeds" and "indelibly affect the essential fairness of the trial itself" are "structural in nature" and subject to reversal per se. *LaMere*, ¶¶ 19, 25-26, 42, 58-61, 75; *Bearchild*, ¶¶ 17-19; *Robbins II*, ¶ 13.[12] Accordingly, a violation of jury selection statutes that materially undermines "the random nature and objectivity of the jury selection process" constitutes a structural error, and is thus presumptively prejudicial and per se reversible. *LaMere*, ¶¶ 19, 25-26, 42, 58-61, 75; *Bearchild*, ¶¶ 17-19; *Robbins II*, ¶ 13. Conversely, violations of jury selection statutes that do not offend the constitutional fair trial rights embodied in those statutes are not presumed prejudicial and are thus subject to harmless error review. *LaMere*, ¶¶ 55, 58-60; *Bearchild*, ¶¶ 15, 23-29. Finally, because a failure to substantially comply with jury selection statutes is presumed prejudicial, a defendant who establishes a failure to substantially comply with those statutes does not need to show evidence of resulting prejudice. *LaMere*, ¶¶ 61, 70-76; *Robbins II*, ¶¶ 7, 13, 21. *Compare Bearchild*, ¶¶ 23-29.

¶98 Here, the District Court misread *LaMere* by (1) reading it to mean that a defendant asserting a substantial failure to comply with jury selection statutes must present evidence

---

[12] *Accord State v. Strommen*, 2024 MT 87, ¶ 29, 416 Mont. 275, 547 P.3d 1227 (citing *State v. Van Kirk*, 2001 MT 184, ¶¶ 38-39, 306 Mont. 215, 32 P.3d 735); *Good*, ¶¶ 59-60 (citing *LaMere*, ¶ 50).

(statistical data) of actual prejudicial impact; (2) requiring Hillious to show that he was actually prejudiced by the clerk and Sheriff's failure to substantially comply with § 3-15-405, MCA; and (3) applying the overruled *Robbins I* standard to deny his motion for a new trial. For reasons explained above, this was error.

### 7. State's Arguments on Appeal Regarding *LaMere*.

¶99 On appeal, the State asserts that *LaMere* is "internally inconsistent" and "manifestly wrong" and should therefore be overruled. The State contends that, in *LaMere*, we erroneously applied the structural error analysis, typically reserved for constitutional violations, to the § 3-15-505/-405, MCA, violation. The State is wrong.

¶100 The critical question in *LaMere* was whether the trial court erroneously concluded that LaMere failed to show the clerk's violation of § 3-15-505/-405, MCA, "prejudiced his substantial rights to a jury drawn and summoned according to law." *LaMere*, ¶ 13. The State, conceding that the clerk's violation constituted a failure to substantially comply with the law under *Robbins I*, "urge[d] this Court to retain" the *Robbins I* "requirement of actual prejudice . . . and hold that LaMere ha[d] failed to demonstrate reversible error pursuant to § 46-20-701, MCA." *LaMere*, ¶¶ 15, 24. Conversely, LaMere, claiming that *Robbins I* was inconsistent with cases like *Tighe*, *Landry*, *Groom*, and *Dvorak*, asked us to overrule *Robbins I* "to the extent that [it] require[d] a showing of actual prejudice" "in addition to a substantial failure to comply with statutory law." *LaMere*, ¶¶ 19-20.

¶101 Recognizing that none of the cited pre-*Robbins I* cases applied § 46-20-701, MCA, and that LaMere offered "no convincing rationale" for why harmless error should not

apply, in resolving the issue, we turned to analogous federal constitutional structural and harmless error principles. *LaMere*, ¶¶ 20-22 (noting evolution from historical common law rule that "any error in the trial court proceedings, regardless of how trivial, mandated appellate reversal," to the modern approach—it is "no longer presumed that simply because an error is committed it is prejudicial"). We noted that, according to the Supreme Court, "a rule of automatic reversal" had become "the exception and not the rule of appellate review." *LaMere*, ¶¶ 22-23, 25 (also noting Supreme Court's "contemporary distinction between 'trial error,' to which harmless error review applies, and 'structural error,' to which harmless error review is inapplicable"). Notwithstanding, we decided to "return to" the pre-*Robbins I* "per se rule of reversal *for a failure to substantially comply* with Montana statutes governing the procurement of a trial jury" and overruled *Robbins I*'s "requirement of prejudice." *LaMere*, ¶ 25 (emphasis added). Among our reasons for *why*, we stated:

> an automatic rule of reversal should prevail because errors in the jury selection process are "structural" in nature and, therefore, affect the very framework within which a trial proceeds. That is, they are errors which indelibly affect the essential fairness of the trial itself. Since such errors precede the introduction of any evidence at trial, the very premise of harmless error review—that a so-called "trial error" can be assessed by a reviewing court for prejudicial impact relative to the other evidence introduced at trial—is absent. Therefore, to engage in harmless error review of a statutory violation in jury selection merely invites abstract and unguided speculation about the possibility of prejudice in an individual case; it is pure conjecture as to whether a properly selected jury would have decided a case differently than an improperly selected jury actually decided the case.

> In addition to recognizing that the subtle, interpersonal dynamics of the jury system are among life's sweet imponderables, this Court finds a per se rule of reversal appropriate as a matter of public policy. Montana statutes governing the procurement of a trial jury exist to secure rights deemed fundamental to our system of justice by minimizing and, indeed, preempting

63

the violation of such fundamental rights from the outset of a trial. The substantial compliance standard vindicates not only the rights of the individual defendant, but also the rights of the public in ensuring that the jury system remains inviolate.

*LaMere*, ¶¶ 26-27.

¶102 We then went on to explain (1) the fundamental constitutional right to trial by an impartial jury, *LaMere*, ¶¶ 28-31; (2) how Montana's jury selection statutes embody and therefore ensure the constitutional fair cross-section guarantee by establishing "objective procedures" for selecting and empaneling juries, *LaMere*, ¶¶ 32-38; (3) why a substantial failure to comply with those statutes undermines their constitutional impetus and is therefore "structural error," *LaMere*, ¶¶ 39-50; (4) why a failure to substantially comply with jury selection statutes is not amenable to harmless error review, *LaMere*, ¶¶ 51-54; and (5) the distinctions between violations constituting a failure to substantially comply with the statutes and "technical" violations or deviations, and how the former are presumptively prejudicial and per se reversible, and the latter are subject to harmless error review, *LaMere*, ¶¶ 55-61 (citing, for example, *Groom* and *Dvorak*). We also separately rejected the State's argument that we should instead apply the federal constitutional test for "violation[s] of the Sixth Amendment's fair cross-section guarantee" to the statutory violation at issue. *LaMere*, ¶¶ 62-69 (noting that, "[a]lthough the statutory procedures for jury selection are designed to protect the constitutional, fair cross-section guarantee, the substantial compliance standard and the constitutional test have as their object of inquiry entirely different subject matters," i.e., "the constitutional, fair cross-section test exists to

challenge a "*jury selection system*" that systematically excludes an identifiable class of citizens from jury service"); Dissent, ¶ 86 n.5.

¶103 *LaMere* is neither internally inconsistent, nor does it establish an automatic or per se rule of reversal for "*any* violation of the statutory jury selection statutes." *Compare* Opinion, ¶¶ 22, 26 (citing *LaMere*, ¶¶ 26-27), and ¶ 26 (stating that *LaMere* "suggests a technical violation . . . is structural error requiring reversal). This was not the law before *LaMere*, and it is not the law now. *Accord Bearchild*; Dissent, ¶¶ 77-81 (discussing pre-*Robbins I* cases). The State seeks to apply a federal constitutional standard here because "personal service is not required by federal courts nor the federal Constitution." State's Response Brief, p. 47. In advancing this argument, the State ignores that § 3-15-405, MCA, *expressly requires follow-up personal service on non-responders*. By asking us to apply a federal standard, the State essentially asks us to ignore the clear language of § 3-15-405, MCA—"the clerk shall certify the failure" to respond "to the sheriff, who shall serve the notice personally on" non-responders. As is well-established, when interpreting a statute, courts are not permitted to "insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Simply because the State prefers that we apply a federal standard and disagrees that the Flathead County clerk's violation of § 3-15-405 was structural and reversible error, it does not follow that we wrongly decided or should not apply *LaMere*.

**8. Application: Hillious Established a Failure to Substantially Comply.**

¶104 Without the benefit of an evidentiary hearing, it is difficult to ascertain the specific nature and extent of the alleged statutory violations in Hillious' particular trial. However, on appeal, Hillious concedes that the Flathead County clerk and Sheriff's violations of § 3-15-405, MCA, as testified to in October 2023 in *State v. Shaw*, Flathead County Cause No. 21-378, occurred during the formation of his jury, too.[13] At the hearing in *Shaw*, the Flathead County clerk testified that, prior to September 2023, she did not certify non-responders to the Sheriff and the Sheriff did not follow-up with personal service on non-responders.[14] When the clerk's § 3-15-405, MCA, violations first became known in Flathead County, the court in *State v. McCarty*, Flathead County Cause No. 23-152(A), took "judicial notice" of the clerk's notification methods.[15] Hillious relies on *Shaw* and *McCarty* here as evidence for his claim.

¶105 I disagree with the District Court's decision to deny Hillious an opportunity to present his evidence, and strongly discourage trial courts from doing so when faced with similar allegations that the state has violated a statute implicating a defendant's constitutional rights. Nonetheless, in this particular case, the record was minimally

---

[13] *See* Appellant's Opening Brief, pp. 22-23 (the clerk "did not certify non-responders to the Sheriff and the Sheriff did not attempt personal service on anyone when [Hillious'] jury was procured").

[14] *See* Hillious' Notice of Supplemental Testimony on Motion for New Trial, Doc. 218 (transcript of October 2023 *Shaw* hearing). *See also* Hillious' Motion for New Trial, Doc. 211, Ex. A (*State v. McCarty*, Flathead County Cause No. 23-152(A), Order Striking the Jury List and Directing the Clerk to Draw a New Panel (Sept. 1, 2023) (underlying *McCarty* Order where the Flathead County clerk's violations of § 3-15-405 first came to light)).

[15] *Id*. Hillious filed his motion for a new trial a little over a month after the *McCarty* Order was issued. He cited to the *McCarty* Order judicially-noticed facts in his motion.

sufficient for the court to assess whether the clerk failed to substantially comply with the statute. Based on the available information, the court should have concluded that the violation constituted a failure to substantially comply under *LaMere*.

¶106 According to the Flathead County clerk, in January 2023, she mailed approximately 7000 jury-service notices for the upcoming six-month trial term, which included a "request[] . . . to submit a questionnaire."[16] Of those 7000 mailings, about 1000 were returned as "undeliverable." The clerk then designated approximately 2050 individuals "available with questionnaire," and approximately 2740 as "available without questionnaire." She assumed that the individuals "available without questionnaire" "probably did" receive the notices (because USPS did not return them) but ignored the notices or were unable to respond for unknown reasons. The clerk testified that she did not certify the undeliverables[17] and "available without questionnaires" (collectively, the non-responders) to the Sheriff for personal service, but instead *removed them* from the jury pool, and excused the rest of the potential jurors for cause. In all, by failing to follow-up with personal service by the Sheriff on non-responders, the clerk effectively excluded over half of the randomly-drawn potential jurors from the jury pool.

---

[16] The clerk testified: "I do not send out . . . a paper questionnaire with the jury notice. . . . Not required to and I do not." She further testified that in Flathead County, "jurors are not required to submit their questionnaires on paper; they are allowed to do that. But they are requested, actually, to send it in electronically if possible. When it's not possible, they submit a paper questionnaire."

[17] The clerk testified that, "[i]f the U.S. Mail Service has certified for me that their notice is undeliverable because they can't be found at that address, I do not send the sheriff out to double-check the U.S. Mail Service."

¶107 The obvious factual distinction between the service method employed here and in *LaMere* is that the Flathead County clerk *mailed* notices to the 7000 randomly-drawn potential jurors, and the clerk in *LaMere* did not mail notices. Despite this distinction, the *nature* of the violation is ultimately substantively the same because, in both cases, the clerks failed to follow-up with personal service on non-responders, thereby arbitrarily excluding them from the jury pool.[18] What constituted a substantial failure to comply with § 3-15-505/-405, MCA, in *LaMere* is likewise a substantial failure to comply here: the clerk's subjective choice to ignore the statute's express follow-up personal service requirement interfered enough with the process to prevent all previously randomly-selected jurors from appearing in court on the day of trial, and allowed jurors to effectively self-exclude by not responding to the notice. Section 3-15-405, MCA, has two critical conjunctive components: notice *and* follow-up personal service upon those who do not respond to that notice. A violation of either materially undermines the constitutional purposes of random selection and objective exclusion embodied in § 3-15-405, MCA. *Accord State v. Hesse*, 2022 MT 12, ¶ 26, 407 Mont. 241, 502 P.3d 666 ("[t]he purpose of the [jury selection] statutes is to *eliminate arbitrariness* in the jury selection process and thus to ensure a fair cross-section of the community" (emphasis added)).

---

[18] More specifically, the clerk's telephone-only service method in *LaMere* excluded 70 people from the jury pool: those who did not leave a contact phone number on their questionnaire, those who did not answer their phones, and those who did not return the clerk's phone call—i.e., people without phones and non-responders. *LaMere*, ¶¶ 10, 70. The *LaMere* clerk's failure to follow-up with personal service excluded these non-responders.

¶108 We recognized the critical importance of the follow-up personal service requirement immediately after *LaMere* in *State v. Highpine*, 2000 MT 368, 303 Mont. 422, 15 P.3d 938. There, the county clerk:

> *mailed* questionnaires and *notices to jurors*, but included in the final list of jurors *only those people who included their telephone numbers* on the returned questionnaires. People who *returned the questionnaires with no phone numbers*, who *did not respond to the notice*, or *did not return the clerk's phone calls* were not included in the final list of jurors.

*Highpine*, ¶ 6 (emphasis added). In other words, although the clerk *mailed notice* as required by § 3-15-505/-405, MCA, she removed from the jury pool people who (1) responded to the notice but did not provide a phone number; (2) responded with a phone number, but did not answer her phone call; and (3) did not respond to the notice at all. In addition to removing those categories of prospective jurors from the jury pool, the clerk did not certify the non-responders to the Sheriff and the Sheriff did not personally serve them notice. *Highpine*, ¶ 7. When it came time to draw for Highpine's jury, the pool contained only those jurors who had responded to the notice, provided contact phone numbers, and answered or returned the clerk's phone call. *Highpine*, ¶ 39. When, Highpine moved to strike his jury based on the clerk's conduct, the trial court denied his motion, stating that, "although the clerk of court had not followed the procedures outlined in § 3-15-505, MCA, the clerk had not discriminated against any particular group and Highpine had not been deprived of an impartial jury." *Highpine*, ¶ 8.

¶109 On appeal, we held that the clerk's "practice did not comply with" the § 3-15-505/-405, MCA, requirement "that when a person fails to respond to the notice, the clerk shall

certify the failure to the sheriff, who shall then serve notice personally on such person and require a response to the notice." *Highpine*, ¶ 39. In light of the trial court's conclusion that he was not "prejudiced by the statutory violations," Highpine included with his appeal supporting "statistical evidence that the clerk's method" excluded "economically disadvantaged people" and "disproportionately excluded" Native Americans. *Highpine*, ¶¶ 8, 38-40. Without referencing or relying on Highpine's evidence of prejudice, we held:

> When a statutory violation directly or materially affects the random nature or objectivity of the jury selection process, it is substantial or material *and cannot be considered non-prejudicial* to the defendant. The District Court's ruling that Highpine *was not prejudiced* by the clerk's failure to comply with the statutory procedure *is therefore in error*. We remand for a new trial with an impartial jury drawn and summoned in a manner substantially in compliance with the law.

*Highpine*, ¶ 41 (citing *LaMere*, ¶ 60); *LaMere*, ¶ 60 ("[a] departure from the statutory scheme that directly or materially affects the random nature or objectivity of the jury selection process establishes a substantial violation *independently of the departure's consequences in an individual case*" (emphasis added)).[19]

¶110 Here, just as in *Highpine*, the Flathead County clerk mailed notice to the randomly-selected potential jurors. And, just like in *Highpine*, the clerk subjectively and arbitrarily excluded from the jury pool jurors who did not respond to the notice. Finally, just as in *Highpine*, the clerk failed to certify the non-responders to the Sheriff for follow-up

---

[19] The clerk in *Robbins I* also not only excluded people without telephones, but also "removed from jury duty" people who "did not answer, did not have an answering machine, or did not return the clerk's telephone call." *Robbins I*, ¶ 14. This constituted a failure to substantially comply with § 3-15-505/-405, MCA, without any accompanying showing of actual prejudicial impact. *Robbins I*, ¶¶ 50-53; *LaMere*, ¶ 61.

personal service. Under both *LaMere* and *Highpine*, the Flathead County clerk's failure to follow-up with personal service on non-responsive potential jurors, as expressly required by § 3-15-405, MCA, was a substantial failure to comply with the statute that undermined the constitutional random selection and objective exclusion requirements embodied in that statute.

¶111 The factual record, including the evidence presented in *Shaw* and *McCarty*, shows that the Flathead County clerk's violations of § 3-15-405, MCA (failure to certify non-responders for follow-up personal service), materially affected the randomness and objective exclusion requirements of the jury selection process and constituted a failure to substantially comply with the statute. Under *LaMere* and *Highpine*, this departure from § 3-15-405, MCA, was a structural error, presumptively prejudicial, and per se reversible, regardless of whether Hillious presented any evidence of actual prejudicial impact. I would therefore conclude that the District Court erroneously (1) required Hillious to make a showing of prejudice to sustain his substantial compliance claim; (2) considered Hillious' substantial compliance claim under the *Robbins I* harmless error standard overruled in *LaMere*; and (3) concluded that, under *LaMere*, Hillious failed to establish that the county clerk and Sheriff failed to substantially comply with § 3-15-405, MCA. For these reasons, I would reverse the District Court's December 15, 2023 order denying Hillious' motion and remand for new trial.

**9. Timeliness Issues.**

¶112 I also disagree with the Court's conclusions here regarding waiver and timeliness. First, the District Court entertained Hillious' § 46-16-702, MCA, motion for a new trial 630 days post-verdict, on the merits, and did not reach the issue of timeliness. The State below and on appeal argues that Hillious waived any challenge to the formation of his jury panel by not filing a timely § 46-16-112, MCA, motion to strike the jury pre-trial and passing his jury for cause post voir dire. The State also argues that Hillious' request for a new trial was untimely under § 46-16-702(2), MCA, and not warranted in the "interest of justice." In response, Hillious contends that he did not knowingly and intelligently waive his fundamental right to an impartial jury; he had "good cause" to challenge his jury panel post-trial; and the "interest of justice" warrants a new trial.

¶113 The catalyst for the events underlying this appeal apparently began on or around August 11, 2023, when, at a pretrial hearing in *State v. Brown*, Cascade County Cause No. 22-302(C), defense counsel raised concerns regarding how the Cascade County clerk was calling juries.[20] Shortly after, the court in *State v. Hinkle*, Cascade County Cause No. 22-242, held a hearing on August 21, 2023, to address "jury issues which had developed in the preceding days" in the county.[21] The next day, the *Hinkle* court issued an order vacating all jury trials in the district.[22] That same day, August 22, 2023, the *McCarty* court

---

[20] *See* State's Response on Hillious' Motion for New Trial, Doc. 217, Ex. 2 (*State v. Hinkle*, Cascade County Cause No. 22-242 Order Vacating All Jury Trials in Cascade County (Aug. 22, 2023)).

[21] *Id.*

[22] *Id.*

"became aware" of the *Hinkle* Order, which "triggered [the] Court's" sua sponte "inquiry into Flathead County's compliance" with § 3-15-405, MCA, without "waiting for the Defendant to file a motion to strike the jury panel under Mont. Code Ann. § 46-16-112."[23, 24] It is unclear from the record on this appeal *how* defense counsel in *Brown* first became aware of the § 3-15-405, MCA, violations in Cascade County.

A. Waiver.

¶114 Before everything else, Hillious' case involves a fundamental state and federal constitutional trial right—the right to a properly-drawn jury. *See Landry*, 29 Mont. at 223, 74 P. at 420; *LaMere*, ¶¶ 32-38; *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S. Ct. 1444, 1447 (1968) (the right to a trial by jury "is fundamental to the American scheme of justice"). As a rule, courts "indulge every reasonable presumption against waiver" and do not "presume acquiescence in the loss of fundamental rights." *State v. Mann*, 2006 MT 33, ¶ 13, 331 Mont. 137, 130 P.3d 164; *State v. Ariegwe*, 2007 MT 204, ¶ 83, 338 Mont. 442, 167 P.3d 815 (citation omitted); *State v. Reim*, 2014 MT 108, ¶¶ 30-31, 374 Mont. 487, 323 P.3d 880. To the extent a criminal defendant's trial rights are waivable, the waiver "must be made specifically, voluntarily, and knowingly." *State v. Howard*, 2002 MT 276,

---

[23] *See* Hillious' Motion for New Trial, Doc. 211, Ex. A (*McCarty* Order) (court "exercis[ed] its inherent power" to remedy what it concluded was "a failure to substantially comply" with § 3-15-405, MCA); State's Response on Hillious' Motion for New Trial, Doc. 217, Ex. 1 (*Shaw* Order Denying Motion for New Trial, p. 8 n.1 (Nov. 9, 2023) (citing *McCarty* Order)).

[24] In fact, the court in *Shaw*, upon recognizing the *McCarty* Order as the triggering event in Flathead County, considered the defendant's otherwise untimely § 46-16-702(2), MCA, motion for new trial where there had been "no showing that [he] or [his] counsel had knowledge or a means of knowledge of the alleged irregularity . . . prior to" the *McCarty* Order. *See* State's Response on Hillious' Motion for New Trial, Doc. 217, Ex. 1 (*Shaw* Order).

¶ 12, 312 Mont. 359, 59 P.3d 1075; *City of Kalispell v. Salsgiver*, 2019 MT 126, ¶¶ 16-18, 396 Mont. 57, 443 P.3d 504 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938) (a waiver is "an intentional relinquishment or abandonment of a known right or privilege")). "'Knowingly' simply means having 'knowledge, information and understanding' of relevant facts before acting or making a decision." *Mann*, ¶ 14.

¶115 It is undisputed on the record here that after voir dire, Hillious passed the jury for cause. However, at that time, the jury formation errors had not yet come to light, and did not become known until the September 1, 2023 Flathead County court's *McCarty* Order—well after Hillious' own trial had concluded. Under these circumstances, passing the jury could not have constituted a *knowing*, much less voluntary waiver of the right to an impartial jury. I would thus conclude that Hillious, at no time during the proceedings, waived or forfeited his constitutional right to trial by an impartial jury, or acquiesced in the state's violation of § 3-15-405, MCA, which infringed that right.

B. Good Cause.

¶116 The Montana Code provides for challenges to jury selection and formation in both criminal and civil trials, which are to be "formed in the same manner." *See* § 46-16-111(1), MCA. Section 46-16-112, MCA, provides that "[a]ny objection to the manner in which a jury panel has been selected or drawn must be raised by a motion to discharge the jury panel" and "[e]xcept for good cause shown, the motion must be made at least 5 days prior to the term for which the jury is drawn." By comparison, § 25-7-222(1), MCA, provides that "[a] challenge to the array or panel may be made and the whole array or panel set aside

74

by the court when the jury was not selected, drawn, summoned, or notified as prescribed by law," but does not proscribe a time limitation on such challenges. Oddly, a civil defendant may raise a jury challenge any time under § 25-7-222(1), MCA, but a criminal defendant, whose liberty is at stake, is limited to raising a jury challenge within the § 46-16-112, MCA, statutory timeline.

¶117 We have not always been so strict in applying § 46-16-112, MCA. For example, in *LaMere*, although we did not specify whether LaMere filed his "motion to strike the jury panel" under § 46-16-112, MCA, it is clear that the statute authorizing his challenge was § 46-16-112(1), MCA (1997) ("[a]ny objection to the manner in which a jury panel has been selected or drawn must be raised by a motion to discharge the jury panel"). *See LaMere*, ¶¶ 2-11, 32 n.2 (citing § 46-16-112, MCA). Regardless of how one construes "the term for which the jury is drawn," LaMere could not have not made his challenge "at least 5 days prior" because he filed his "motion to strike the jury panel" *after* the clerk pulled the jurors for his trial. *LaMere*, ¶¶ 4-5; § 46-16-112(1), MCA. *See also Robbins I*, ¶ 14 (objecting to jury procurement process "on the first day of trial").[25]

---

[25] *Accord Fitzpatrick*, 178 Mont. at 535-39, 569 P.2d at 387-89. In *Fitzpatrick*, despite the defendants' failure to follow the requirements of § 95-1908, RCM (1947) (1975) (now § 46-16-112, MCA), we nonetheless considered the merits of his alleged jury selection statutes violation. There, we stated that the defendants' failure to follow § 95-1908 "*will not foreclose our consideration* of whether the jury panel was properly selected and drawn where the fundamental constitutional rights of the defendants are at stake"—including their contention that "the jury panels in the instant case were selected and drawn in total disregard of the applicable Montana law." *See Fitzpatrick*, 178 Mont. at 535-39, 569 P.2d at 387-89 (citing *Ledger v. McKenzie*, 107 Mont. 335, 85 P.2d 352 (1938) (emphasis added)).

¶118 Hillious points to *Dvorak* and *Solberg v. Cnty. of Yellowstone*, 203 Mont. 79, 659 P.2d 290 (1983), in support of his argument that his "post-trial discovery of the defective jury panel constituted good cause to challenge the panel beyond the" § 46-16-112, MCA, "deadline." In *Dvorak*, the defendants objected to the jury selection method post-verdict. *Dvorak*, 196 Mont. at 168-69, 639 P.2d at 63. In *Solberg*, following our holding in *Dvorak*, the defendants raised their identical challenge on appeal. *Solberg*, 203 Mont. at 81-83, 659 P.2d at 291-92. In both cases, we applied the no knowledge or "means of knowledge" exception recognized in *Ledger v. McKenzie*, 107 Mont. 335, 85 P.2d 352 (1938), to review the defendants' otherwise untimely claims.

¶119 In *Ledger*, we noted that the "general rule" is that, "by failing to challenge or object, a party waives an irregularity in the impaneling of a jury." *Ledger*, 107 Mont. at 340-41, 85 P.2d at 353. We also recognized an exception to that general rule for cases where "counsel does not have the knowledge, or means of knowledge, of the irregularity in the drawing of the jury, or the panel from which it is selected until after the verdict." *Ledger*, 107 Mont. at 340-41, 85 P.2d at 353. In *Ledger*, we declined to apply the exception to the defendants' jury challenge, raised for the first time in a motion for new trial, because "the minutes of the court in the cases in which these special panels were drawn clearly indicate[d]" the jury selection violations and counsel thus had the "means of knowledge . . . at their command." *Ledger*, 107 Mont. at 340-41, 85 P.2d at 353. Conversely, in *Dvorak*, the jury selection violation was not apparent until after trial, and counsel "had no reason, prior to his inquiries, to suspect that the statutory procedures were

not being followed." *Dvorak*, 196 Mont. at 171-72, 639 P.2d at 64. Similarly, in *Solberg*, we rejected the State's argument that "veteran" counsel should have known of the erroneous jury selection process because "[a]lthough appellant's counsel knew that the jury was preselected, it does not follow that he knew or should have known that the proper procedures were not followed." *Solberg*, 203 Mont. at 83-84, 659 P.2d at 292. In both cases, "counsel had a right to rely on the judge and clerk to follow their statutory duties." *Solberg*, 203 Mont. at 84, 659 P.2d at 292 (quoting *Dvorak*).

¶120   The State contends that *Ledger*, *Dvorak*, and *Solberg* do not apply because they are civil, not criminal, cases. But, both § 46-16-112, MCA, and *Dvorak* recognize an exception to time bars for defendants who challenge jury formation—§ 46-16-112 allows a late challenge to jury formation for "good cause" and *Dvorak* allows a late challenge to jury formation when the defendant had no knowledge or "means of knowledge" of a statutory violation. Either exception provides a mechanism for judicial review of an alleged statutory violation that infringes on a defendant's constitutional fair trial right.

¶121   By contrast, in *State v. Roberston*, 2014 MT 279, 376 Mont 471, 336 P.3d 367, we declined to review the defendant's unpreserved claim that the state failed to substantially comply with jury selection statutes by erroneously including in his jury pool people who were not residents of the county. *Robertson*, ¶ 43. Under the general rule that, "[t]o preserve an issue for appeal, an appellant must object as soon as the grounds for the objection become apparent," we held that Robertson "should have known" about the out-of-county jurors at voir dire, because district court rules required that jury

77

questionnaires be available to counsel at that stage. *Robertson*, ¶ 46 (citation omitted). He was also formally "put on notice" at sentencing, when the restitution affidavit disclosed the out-of-county jury pool members. *Robertson*, ¶¶ 14, 45. Instead of objecting at either phase, Robertson relied on the trial court's notice that his jury "had been randomly selected pursuant to Montana's jury selection procedures"; stipulated that the jury was properly formed and summoned; and "raised no concern when presented with the restitution affidavit." *Robertson*, ¶¶ 44-46. Where none of the out-of-county jurors actually sat his jury and he never exercised preemptory challenges against them, we declined to exercise plain error review of his unpreserved claim because we were "not convinced that the inclusion of these three jurors in the jury pool resulted in a manifest miscarriage of justice, left unsettled the question of the fundamental fairness of the trial or proceedings, or compromised the integrity of the judicial process." *Robertson*, ¶ 47.

¶122 Here, the Court concludes that Hillious failed to establish "good cause" for his untimely challenge, reasoning that because defense counsel in *Brown*, *Hinkle*, and *McCarty* were able to ascertain the county clerk's violations of § 3-15-405, MCA, Hillious' counsel likewise had "the means of discovering the irregularity prior to trial." Opinion, ¶¶ 37-38. But the record shows that only the defense counsel in *Brown* originally discovered the violations. It is unclear from the Cascade County court's order in *Hinkle* whether counsel or the court raised the issue—the order states that "*the Court* called" the August 21, 2023 hearing "because of jury issues which had developed in the preceding days."[26] The

---

[26] *See* State's Response on Hillious' Motion for New Trial, Doc. 217, Ex. 2 (*Hinkle* Order) (emphasis added).

*McCarty* court resolved the issue ahead of any defense motion to strike the jury. Because it is unclear from the record on this appeal *how* defense counsel in *Brown* first became aware of the § 3-15-405, MCA, violations in Cascade County, it does not follow that, because Brown's counsel successfully raised the issue pretrial, all other defense counsel in counties across the state were similarly informed or had the means to be prior to jury formation. There is no easy way to establish that elected county officials did not follow jury selection laws short of deposing them or subpoenaing them to testify at a hearing. Holding a hearing and requiring testimony is exactly what *the court* did in *McCarty*, immediately after it learned about the Cascade County *Hinkle* Order. Given those obstacles, it is not for lack of diligence that the § 3-15-405, MCA, violations in Flathead County were not found earlier.

¶123 Therefore, like the defendants in *Dvorak* and *Solberg*, Hillious was entitled "to rely on the judge and clerk to follow their statutory duties." And, just like in *Dvorak* and unlike in *Roberston*, Hillious had no prior indication, or reason to believe, that the county clerk and Sheriff had not complied with § 3-15-405, MCA, as required by law; nor was he "on notice" that his jury had been formed in violation of jury selection statutes implicating his constitutional rights until the *McCarty* Order. Hillious had no means of knowing about the Flathead County clerk's statutory violations until after the *McCarty* Order. I would thus conclude that Hillious established "good cause" to raise his challenge to the formation of his trial jury for the first time, post-verdict.

C. The Interest of Justice.

¶124 Finally, I believe that Hillious is entitled to a new trial in the "interest of justice." It is undisputed that his October 6, 2023 motion for new trial was untimely under § 46-16-702(2), MCA (new trial "motion must be filed by the defendant within 30 days following a verdict or finding of guilty").[27] However, § 46-16-702(1), MCA, authorizes a district court to "grant the defendant a new trial if required in the interest of justice." We have recognized that § 46-16-702(1) embodies a court's inherent remedial power, which is not limited by -702(2) time constraints. *State v. Morse*, 2015 MT 51, ¶¶ 22-29, 378 Mont. 249, 343 P.3d 1196; *State v. Brummer*, 1998 MT 11, ¶¶ 38, 45-47, 287 Mont. 168, 953 P.2d 250 (court's inherent authority to grant a new trial "embodies the equitable concept that neither a wronged litigant nor society itself can afford to be without some means to remedy a palpable miscarriage of justice" (citation and internal punctuation omitted)).

¶125 The Court concludes that Hillious cannot meet the "interest of justice" standard "because the clerk's error did not affect the structural fairness of the proceeding." Opinion, ¶ 38. For all the reasons stated above, I disagree. Under *LaMere* and *Highpine*, the county clerk's failure to substantially comply with § 3-15-405, MCA, materially undermined the random selection and objective exclusion principles embodied in the statute. If a fundamental right is to mean anything, a defendant should not be precluded from asserting that a statutory violation infringed his rights by application of rigid timeframes. Sections

---

[27] Hillious was convicted on January 14, 2022. On May 4, 2023, he filed a timely notice of appeal. Hillious learned of the September 1, 2023 *McCarty* Order on September 18, 2023, and on October 6, 2023, filed a motion for a new trial. On October 31, 2023, we stayed Hillious' appeal pending disposition of his motion for a new trial.

46-16-112 and -702, MCA, and related procedural rules, exist to prevent dilatory tactics, not to bar legitimate constitutional claims of which a defendant had no prior knowledge or any real means of acquiring knowledge. The existence of exceptions for "good cause," no knowledge or "means of knowledge," and the "interest of justice" support a more flexible approach to considering these types of claims.

¶126 Finally, the Court notes that "time requirements do not foreclose other post-judgment or collateral relief which may otherwise be available for a criminal defendant to raise constitutional irregularities in the trial court proceedings." Opinion, ¶ 37. While true, post-conviction relief has its own complex procedural and time bars, which, without the guaranteed benefit of court-appointed counsel, similarly situated defendants no doubt will have difficulty navigating.[28] In fact, it is not certain whether Hillious will be able to raise his jury selection challenge successfully in post-conviction proceedings, given that he has appealed the issue here. I believe that the only available remedy for Hillious lies in this motion for a new trial, and the only exception to the untimeliness of that motion is the § 46-16-702(1), MCA, "interest of justice" exception.

¶127 An obvious tension exists between the § 46-16-702(1), MCA, new trial remedy in the "interest of justice" and per se rule of reversal for structural error arising out of *LaMere*. The statute permits some balancing of interests in granting a new trial; *LaMere* required that a failure to substantially comply with jury selection statutes is reversible error without additional analysis. *See LaMere*, ¶¶ 19, 25 (violation "per se reversible without" defendant

---

[28] *See* §§ 46-21-101(1), -102(1), (2), -105(1), (2), (3), 46-22-101(2), and 46-8-103, MCA.

having to provide "any additional proof of prejudice"; overruling "requirement of prejudice"). *LaMere*, however, did not address the issue as to whether a defendant could waive a structural defect in jury formation by failing to seek a new trial in a timely manner under the circumstances. As such, I read *LaMere* more narrowly as providing only that a failure to substantially comply with § 3-15-505/-405, MCA, on its own is presumptively prejudicial structural error which requires reversal and new trial, unless the request for a new trial is not timely under the circumstance and not in the interests of justice. Arguably there could be situations where jury formation issues could support presumptive reversal but the defendant failed to take any reasonable action to discern the jury formation problem for so long that the interests of justice no longer support mandating a new trial. That, however, is not the situation here. Hillious sought a new trial immediately upon learning of the jury formation issue, during his appeal process and long before the expiration of the time in which to seek post-conviction relief. Under such circumstances, it is appropriate to grant him a new trial.

### 10. Conclusion.

¶128 In light of the foregoing, the Flathead County clerk's failure to substantially comply with § 3-15-405, MCA, represents a structural error that is presumptively prejudicial and per se reversible under *LaMere*. The District Court's misapplication of the harmless error standard and its insistence on a separate showing of prejudice requires reversal. Moreover, contrary to the Court's conclusion here, Hillious did not waive his claim, nor was it

82

untimely.  I therefore dissent from the Court's decision to affirm the District Court's denial of Hillious' motion for a new trial.

/S/ KATHERINE M BIDEGARAY

Justice Ingrid Gustafson joins in the dissenting Opinion of Justice Katherine Bidegaray.

/S/ INGRID GUSTAFSON